In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2769

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

MICHEL THYFAULT,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 779—**James B. Moran**, *Judge.*

ARGUED OCTOBER 20, 2008—DECIDED AUGUST 26, 2009

Before BAUER, KANNE and WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge*. On November 4, 2004, a multi-count superceding indictment charged Michael Thyfault and other individuals with multiple mail fraud and tax evasion offenses. The indictment accused the defendants of being the prime movers in a major scheme to defraud Intercounty Title Company of Illinois ("Intercounty") and related entities. The scheme involved theft and mismanagement of Intercounty's escrow funds over

a ten-year period, during which time Intercounty's deficits were covered by thefts from its escrow account. Thyfault was charged with one count of conspiracy to commit mail fraud and four counts of mail fraud. The jury acquitted Thyfault on the conspiracy count, but was unable to reach a verdict on the mail fraud counts. The government then sought to retry Thyfault on the mail fraud counts; Thyfault moved to dismiss the charges on the basis of issue preclusion, arguing that his conspiracy acquittal precluded the government from attempting to prove his intent to defraud, an element of the mail fraud charges. The district court agreed and granted the motion. The government brings this appeal, contending that the district court erred in granting Thyfault's motion because a rational jury could well have found that Thyfault intended to violate the law, but not in agreement with others as charged in the conspiracy. We reverse.

## I. BACKGROUND

Jack Hargrove and Laurence Capriotti were co-owners of Intercounty, a Chicago-based title insurance and escrow agent. The company sold title insurance policies issued by Stewart Title Guaranty Company. Thyfault, a certified public accountant, was hired as Intercounty's chief financial officer in 1989, a capacity in which he served until 1995.

By the late 1980s, Intercounty was running an annual deficit in the millions as the result of a price war in the title insurance market. To cover its losses, Intercounty

invested in junk bonds in the hopes that the bond yield would outperform their real estate obligations. The plan backfired, and Intercounty got itself into a hole from which it never recovered.

From about 1990 onward, Intercounty's deficits were offset by thefts from the escrow account. During that time, company management engineered numerous fraudulent schemes that ultimately robbed the company of more than $60 million. Under one such scheme, Capriotti and Hargrove purchased certificate of deposits ("CDs") with escrow funds which were then used to secure loans. When the loans came due, Capriotti and Hargrove cashed out the escrow-funded CDs and paid off the loans. Thyfault directed the transfer of escrow funds to purchase at least two CDs. According to Thyfault, he was skeptical of the practice of buying CDs with escrow money and did not understand how it benefitted the company.

The misuse of the escrow funds did not stop there. Another large overdraft related to an escrow file associated with a golf course community that Capriotti and Hargrove built known as Ruffled Feathers. In 1992, Capriotti, Hargrove and Thyfault were among those who met to discuss the negative balance in the Ruffled Feathers escrow file. During that meeting, Thyfault had with him a printout showing the negative balance, which was approximately $5 million at the time. Capriotti discussed a plan to falsify records of the deficit in a report that would be circulated to other mangers at Intercounty. According to Thyfault, he did not contribute

to the conversation about what was to be done or partici-
pate in the alteration of the records.

Intercounty's escrow account was also depleted by
the direct transfer of escrow money into the operating
account. James Wallin, Intercounty's treasurer, carried
out the transfers at Capriotti's direction. At a civil deposi-
tion, Thyfault acknowledged knowing that transfers
had been made from the escrow account to the operating
account.

One reason Capriotti and Hargrove's thefts escaped
detection was a large float in the escrow account that
could be as high as $20 or $30 million on any given
day. Another reason was a bogus escrow agreement
Capriotti and Hargrove cooked up with Independent
Trust Corporation ("Intrust"), a company specializing in
land trusts and self-directed IRAs. Under the deal,
Intrust transferred trust holders' cash investments to
Intercounty's escrow account. Intercounty was to invest
the Intrust money in government obligations and then
pay out the resulting interest to Intrust for the benefit of
its trust holders. Intrust was, not coincidentally, owned
by Hargrove. Thyfault's responsibility was to play the
role of scorekeeper, monitoring the transfer of funds
back and forth between Intrust and Intercounty and
calculating the interest and fees. These scores were kept
on a spreadsheet, a copy of which Thyfault provided to
Intrust each month. However, the spreadsheets reflected
false information. Although the accounting showed
interest payments being made to the escrow file set up
for Intrust's deposits, no such deposits were made after

January 1994 because Intercounty lacked the funds to honor them. According to Thyfault, he had reservations about this practice, but did not believe it was illegal since it had been authorized by the appropriate parties; he did not raise his concerns with Capriotti.

In November 1996, Capriotti fired Thyfault. Thyfault was provided with a severance package that paid him his full salary for six months and a percentage of his salary for an additional eighteen months. According to Intercounty's comptroller, George Stimac, Capriotti gave Thyfault the severance package to "keep him quiet" because he was the "weak link" in the Intercounty hierarchy. After Thyfault's firing, the fraud continued for several more years. During that time, Capriotti and Hargrove continued to transfer funds from Intrust to Intercounty and from Intercounty's escrow account to its operating account. By the late 1990s, however, the various schemes unraveled and both Intercounty and Intrust collapsed.

Thyfault was charged with four counts of scheming to defraud through the U.S. mail, in violation of 18 U.S.C. § 1341, and one count of conspiring to participate in the fraud scheme, in violation of 18 U.S.C. § 371. Thyfault and Hargrove were jointly tried before a jury, while the other defendants involved in the fraudulent scheme entered into plea agreements with the government.

Thyfault did not dispute that the charged scheme existed or that large amounts of money were stolen, but argued that the scheme was perpetrated by Capriotti and others without his knowing participation. Thyfault's

counsel acknowledged that Thyfault may have been negligent, but claimed that his client did not act with an intent to defraud.

When the jury returned its verdicts, Hargrove was found guilty of conspiracy to commit mail fraud and mail fraud but the jury acquitted Thyfault on the conspiracy count and was unable to reach a verdict on the scheme-to-defraud charges. The jury did not indicate which mail fraud element or elements it was unable to unanimously agree upon.

The government obtained a second superceding indictment charging Tyfault with four counts of scheming to defraud using the U.S. mail. Thyfault moved to dismiss the charges on the grounds of collateral estoppel, arguing that the acquittal on the conspiracy count precluded his retrial on the fraud scheme charges. The district court granted the motion, holding that Thyfault met his burden of showing that, by acquitting him of the conspiracy charge, the jury necessarily found no intent to defraud. The government filed a timely appeal.

## II. DISCUSSION

On appeal, the government contends that the district court erred in determining that issue preclusion applied when it granted Thyfault's motion to dismiss the second superceding indictment. We review de novo determinations of issue preclusion. *United States v. Bailin*, 977 F.2d 270, 281 (7th Cir. 1992).

In a criminal context, issue preclusion, or collateral estoppel, means that when an issue of ultimate fact has

been determined by a valid and final judgment, the same parties cannot re-litigate that issue in any future lawsuit. *United States v. Salerno*, 108 F. 3d 730, 741 (7th Cir. 1997). This court has identified three rules governing the application of issue preclusion in criminal cases: (1) the court should not apply the rules of issue preclusion in a hypertechnical manner, but rather, should examine the pleadings, evidence, charges and other relevant material to determine whether a rational jury could have based its verdict on another issue; (2) issue preclusion only applies when a relevant issue in a subsequent prosecution is an "ultimate issue," meaning an issue that must be proven beyond a reasonable doubt; and (3) the defendant bears the burden of proving that the prior jury necessarily determined the "ultimate issue." *Id*.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To obtain a conviction, the government must prove: (1) that the conspiracy existed; (2) that the defendant knowingly became a member of the conspiracy with the intent to further it; and (3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy. 18 U.S.C. § 371. To convict a defendant of mail fraud, the government must prove: (1) that the defendant knowingly devised or participated in a scheme to defraud or obtain money or property by means of materially false pretenses, representations, promises, or omissions as described in that count of the indictment; (2) that the defendant did so knowingly and with the intent to defraud; and (3) that the defendant used the United States mail as a carrier. 18 U.S.C. § 1341.

The question is thus whether the jury's acquittal on the conspiracy count precludes the government from attempting to prove Thyfault's intent to defraud, an element of the mail fraud charges.[1] The district court found that the only explanation for the jury's acquittal on the conspiracy count was that it had concluded Thyfault in fact lacked the *intent* to defraud. The government now argues that that interpretation is too narrow; it contends that the jury could have based the acquittal merely on a reasonable doubt that Thyfault *joined the agreement* to defraud.

Because Hargrove was convicted of the conspiracy charge, it is settled that the jury found the existence of an agreement between two or more of the defendants to commit mail fraud, and that an overt act was taken by at least one individual in furtherance of that agreement. Additionally, we can safely say that, in its acquittal of Thyfault on the same charge, the jury determined that the government had failed to meet its burden concerning at least one of the three requisite elements.

Reviewing the jury's verdict and the evidence at trial, one possibility is that the jury concluded that although a conspiracy to commit mail fraud existed, the govern-

---

[1] The fact that the jury was unable to reach a verdict on the mail fraud charge after acquitting Thyfault of the conspiracy charge does not factor into our analysis. The Supreme Court recently considered this question in *Yeager v. United States*, 2009 WL 1685935 (June 18, 2009), holding that, "consideration of hung counts has no place in issue preclusion analysis."

ment failed to prove that Thyfault acted with intent to further the conspiracy to defraud. This is the determination that the district court reached and the one that Thyfault urges us to affirm.

We agree with the government that other plausible possibilities exist. For instance, it is certainly possible that the jury concluded that the government failed to prove Thyfault had joined the agreement, and as such, did not reach the issue of whether he acted with intent to further its underlying purpose, the scheme to defraud Intercounty.

Thyfault bears the burden of demonstrating that the acquittals in the first trial necessarily decided in his favor an issue that would ultimately be required to convict him in the second. *Salerno*, 108 F. 3d at 741. We believe he has failed to do so. To obtain a conviction for mail fraud, the government would have to prove beyond a reasonable doubt Thyfault's intent to defraud; but, we are unpersuaded that this element was decided against the government when Thyfault was acquitted of conspiracy.

Thyfault argues that the issue of whether he knowingly became a member of the conspiracy is inextricably linked with that of whether he acted with intent to advance its ends because of the manner in which the government presented its evidence at trial. It is true, as Thyfault claims, that the government argued at trial that the same evidence would prove Thyfault's guilt concerning both the conspiracy and mail fraud counts because that evidence would prove that Thyfault know-

ingly joined the scheme to defraud and did so with the intent to accomplish its objectives. However, the central inquiry here is not whether the government's theory of the case as presented at trial continues to hold water, but whether a rational jury could have based its acquittal on an issue other than the one Thyfault seeks to foreclose from consideration. We believe it could have.

Given the distinction between the crime of conspiracy, which requires an agreement to commit an illegal act, and the crime of engaging in a fraudulent scheme, which does not, the jury could have acquitted Thyfault of the conspiracy for reasons other than a determination in his favor on the element shared in common with the mail fraud charge: an intent to defraud.

Thus, because nothing about Thyfault's conspiracy acquittal leads to the conclusion that the jury necessarily determined that he did not act with an intent to defraud, issue preclusion does not bar the government from trying Thyfault on the mail fraud charge.

## III. CONCLUSION

Therefore, we REVERSE the district court's judgment dismissing the mail fraud counts.