In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3010

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMARKUS GORMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cr-0156—**Sarah Evans Barker**, *Judge.*

ARGUED APRIL 6, 2010—DECIDED JULY 28, 2010

Before KANNE, ROVNER, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*.    Jamarkus Gorman was con-
victed of perjury after testifying falsely before a grand
jury. He now challenges both the basis for his perjury
conviction and the admission of evidence at his trial.
We affirm.

## I. BACKGROUND

In June 2007, federal law enforcement agents began investigating the drug activities of Jermoine Gorman.[1] After Jermoine was arrested for drug trafficking, federal officials obtained and executed a search warrant at Jermoine's Indianapolis residence in conjunction with that arrest. During this search, they discovered a lease in the name of "J. Gorman" for a condominium located in an exclusive gated community, Lion's Gate Condominium Complex, along with keys to and pictures of a Bentley. After contacting the complex, officials discovered that the lease was actually in Appellant Jamarkus Gorman's name.

Intending to seize the Bentley as proceeds of Jermoine's illegal drug activity, officials arranged to meet Jamarkus at the Lion's Gate complex the following day. After explaining to Jamarkus that his cousin had been arrested and that they were looking for proceeds of drug trafficking, including the Bentley, Jamarkus consented to a search of his condominium unit. While searching his condominium, officials asked Jamarkus if he was aware of a Bentley belonging to Jermoine that was stored in the complex's garage. Jamarkus said that he was unaware of any Bentley, let alone one stored in the basement garage.

Upon completion of their search of the condominium unit, Jamarkus escorted the officials to the basement

---

[1] Jermoine Gorman is Appellant Jamarkus Gorman's cousin. We will refer to the former as "Jermoine" and the latter as "Jamarkus."

garage. The garage was designed so that one wall was composed of tandem parking spots and the opposite wall was comprised of single parking spots. Dividing the wall of tandem spots into two was an enclosed section containing the mailroom, a storage space, the elevator bank, and the elevator equipment room.

Jamarkus led the officials to the garage via the elevator. When they emerged, Jamarkus pointed out what he said were his assigned parking spots, referring generally to the areas covered by spots 20 through 22. Unsurprisingly, those spots were vacant. Their investigation concluded, the officials left empty-handed.

Unbeknownst to the officials, however, was the fact that Jamarkus actually utilized tandem spots 31A and B—spots which were located on the other side of the division created by the elevator bank and which were not visible from the location of spots 20 through 22.[2] In fact, on the day that the officials searched the complex, the Bentley was parked against the wall in parking spot 31 and in front of it was parked an Expedition.[3]

---

[2] Although there is a dispute in the record as to whether Jamarkus showed officers the entire garage or only a portion of it, it is undisputed that officers did not locate the Bentley in the garage that day.

[3] There is some debate about whether Jamarkus leased the tandem spots numbered 31 or the tandem spots numbered 24. The leasing agent testified that Jamarkus leased the spots in slot 24, while the maintenance technician testified that Jamarkus

(continued...)

Later that same afternoon, a Friday, condominium maintenance technician Kevin McCray saw Jamarkus fiddling with the trunk of the Bentley. Jamarkus explained to McCray that he had locked his keys in the trunk. When McCray returned to work the following Monday, the Bentley was gone, leaving in its place only an oil spill on the floor where the car had once been.

Law enforcement officials later determined that over the weekend preceding discovery of the car's disappearance, Jamarkus had enlisted the help of a handful of individuals in removing the Bentley from the garage. These individuals were Chavis Taylor; two tow truck drivers, Tyrone Whitson and Suglett Miller; two crooked Indianapolis police officers, Jason Edwards and Robert Long; and an individual known only as "J-Rock."

On the day of the theft, Jamarkus led all of the participants to the garage, using the key pad to enter. He instructed the men to pour oil onto the floor to allow the Bentley's tires to slide; the men complied with Jamarkus's direction, wenching the Bentley from the garage floor to the bed of a flatbed wrecker. They covered the Bentley and removed it from the condo-

---

[3] (...continued)
was assigned the spots in slot 31. Because residents did not always park in their assigned spots, and because the car was parked in slot 31 both when officers arrived and when the subsequent theft of the vehicle occurred, it is evident that regardless of his parking assignment, Jamarkus utilized the spaces in slot 31.

minium garage. Taylor, Edwards, and Long escorted the Bentley to Whitson's automotive shop. At the shop, Jamarkus explained that he needed to retrieve an ID from the car and two bags from the trunk. The men then cut the soft top to access the car and pried open the trunk. The bags were removed and given to Jamarkus. Then Edwards and Long paid Miller, Whitson, and J-Rock $1,000 to $5,000 each. The men paid Taylor $10,000 for his involvement. Taylor was sure that his payment had come from money contained in the bags seized from the Bentley, and later claimed to have been told that the bags contained approximately $100,000. The men then took the Bentley to a parking lot and abandoned it. Law enforcement officers discovered the abandoned car the ensuing Monday morning.

Following these events, and in an unrelated investigation, Internal Revenue Service Agent Eric White began investigating a money laundering scheme perpetrated by Jermoine. Jermoine and two other individuals were later charged with money laundering. As part of the indictment process, Jamarkus was required to testify before a grand jury. During the course of Jamarkus's testimony, he was questioned about his residence at Lion's Gate. He was also questioned about the Bentley.

Jamarkus began his testimony by acknowledging that he had heard rumors that Jermoine owned a Bentley but that he had never seen the car. Grand jurors then proceeded to question Jamarkus about the presence of a Bentley in his Lion's Gate garage and its subsequent removal. The statement serving as the basis for Jamarkus's eventual perjury conviction occurred during this exchange:

> Grand Juror: Mr. Gorman, did you have a Bentley in your garage at Lion's Gate?
>
> Jamarkus: No.
>
> Grand Juror: Ever?
>
> Jamarkus: No, never.

(Appellant's Br. at 4; Appellee's Br. at 14.)

Much like the infamous Al Capone, it was not his more offensive criminal activity that eventually caught up with Jamarkus. Rather, it was the three words encompassing his grand jury testimony that ultimately served as the basis for Jamarkus's indictment and eventual conviction. Jamarkus was charged with perjury and proceeded to trial.

Prior to Jamarkus's perjury trial, the government made known its intention to admit certain witness statements detailing Jamarkus's orchestration of the Bentley theft and his subsequent retrieval of money from the car. In response, Jamarkus filed a motion in limine to suppress the evidence, arguing that the theft itself was impermissible "other bad acts" evidence under Federal Rule of Evidence 404(b). The government countered that the witness testimony was admissible under the "inextricable intertwinement" doctrine, as well as Rule 404(b) and, as regarding certain evidence, Rule 801(d)(2)(E).

The district court ultimately determined that the evidence of the theft was admissible under the inextricable intertwinement doctrine. Therefore, Rule 404(b)'s limitations were inapplicable. The court reasoned that the

evidence provided proof of the perjury and illuminated Jamarkus's motivation to lie. The court thus admitted the evidence despite Jamarkus's failure to request a limiting instruction to the jury.

Following the trial, the jury convicted Jamarkus of perjury. The court sentenced him to thirty-six months' imprisonment with two years' supervised release. Jamarkus now appeals both the basis for his perjury conviction and the admission of evidence relating to the Bentley's theft. We address each in turn.

## II. ANALYSIS

### A. Sufficiency of Evidence

Jamarkus first argues that the government's evidence is insufficient to sustain his perjury conviction. Jamarkus bases this argument on his interpretation of the word "have." Jamarkus argues that he could not have perjured himself because he did not "have" a Bentley. Because the Bentley belonged to his cousin Jermoine, so goes the argument, Jamarkus was being truthful when he testified that he did not have a Bentley in his garage.

We review a sufficiency of the evidence question in the light most favorable to the government. *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006). Thus, a jury's decision will be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005) (internal quotation marks omitted). To support a conviction of perjury be-

yond a reasonable doubt, the government had the burden of proving that (1) the defendant, while under oath, testified falsely before the grand jury; (2) his testimony related to some material matter; and (3) he knew that testimony was false. 18 U.S.C. § 1623.

When reviewing sufficiency of the evidence through the lens of a perjury conviction, however, an unresponsive yet literally true answer will not sustain the conviction. *Bronston v. United States*, 409 U.S. 352, 356-58, 362 (1973). Jamarkus therefore argues that his answer was literally true—he did not "own" the Bentley so could not "have" a Bentley in the Lion's Gate garage. He rests his reasoning on the definition of the word "have," which has multiple meanings, asserting that its most predominant meaning is ownership and control. Based on this understanding of "have," Jamarkus claims that while his answer to the grand jury may have been misleading and evasive, it was literally true.

When stretched to its logical limit, this argument has some merit. But it is still a stretch, and we are not in the business of engaging in mental gymnastics. *See, e.g.*, *In re Mayer*, 108 F. 599, 614 (7th Cir. 1901) (Jenkins, J., dissenting) (criticizing the court for "indulg[ing] [in] a game of judicial battledoor and shuttlecock, interesting, indeed, as an example of mental gymnastics, but without the sanction of reason or the warrant of law.").

And in any event, our own determination of the meaning Jamarkus ascribed to "have" means little in this context, when Jamarkus was convicted by a jury of his peers. We agree initially with Jamarkus that "to have" has

more than one meaning. *See Webster's Third New International Dictionary* 1039 (Philip Babcock Gove ed., 3d ed. 1986). When a word has more than one potential meaning, it must be examined in context to determine the meaning the defendant ascribed to it. *United States v. Williams*, 536 F.2d 1202, 1205 (7th Cir. 1976). As Jamarkus correctly points out, the fault for unclear, ambiguous, or vague answers rests with the questioner. *Bronston*, 409 U.S. at 360. But what Jamarkus ignores is that our precedent dictates that even when a question or answer is ambiguous, a conviction may still be upheld if a jury has been called upon "to determine that the question *as the defendant understood it* was falsely answered . . . ." *United States v. Scop*, 940 F.2d 1004, 1012 (7th Cir. 1991) (internal quotation marks omitted).

What meaning Jamarkus ascribed to the question and whether his denial was knowingly false were questions within the jury's province. *Id.* The jury necessarily determined that Jamarkus understood "have" as signifying possession, and yet he readily and knowingly made a false denial. Under these circumstances, we conclude that any rational trier of fact could have found the elements of perjury beyond a reasonable doubt. *See Melendez*, 401 F.3d at 854.

Yet Jamarkus asserts that even if "have" means mere possession, he did not possess the vehicle. We agree with the government, however, that there is ample evidence of conduct that is consistent with Jamarkus's possession of the Bentley. First, Jamarkus stored the car and sought to protect it. This is evidenced by his rental

of the condominium unit, his secured access to the unit and the garage, his request that the maintenance technician watch over his high-end cars, and his effort to conceal the Bentley from law enforcement officers.

Additionally, Jamarkus at least implicitly claimed the Bentley as his own on two occasions. On the first occasion, he told McCray that he was bringing two "fancy" vehicles into the garage, and asked McCray, whose office was close to parking spot 31, to watch over the vehicles. On the second occasion, when McCray saw Jamarkus near the trunk of the Bentley, Jamarkus claimed to have locked "his" keys in the trunk.

Finally, in addition to storing the car, protecting it, and claiming it as his own, Jamarkus definitely exercised control over the vehicle when he orchestrated its removal from the garage. But Jamarkus argues that because he had to steal the vehicle to gain access to its contents, he could not have owned or possessed the Bentley. Even though this argument is true with regard to legal ownership, it does not negate the fact that Jamarkus possessed the vehicle by storing it in a garage in his gated community. The fact that he had to take control of the Bentley to access its contents does not, by itself, mean that Jamarkus did not "have" the vehicle in his Lion's Gate garage. At the very least, when the car was placed on the flatbed in the garage at Jamarkus's direction, it was, for all intents and purposes, in Jamarkus's possession.

Although certainly a clever tactic, Jamarkus's argument about the meaning of the word "have" stretches and

distorts the normal meaning of that word. This is especially true in light of Jamarkus's actions, which were consistent with possession. To now claim that he did not "have" the Bentley in his garage requires a sizeable leap, to be sure. The jury was unwilling to make that leap, and we are unwilling to disturb its conclusion.

### B. Admission of Evidence

Jamarkus also challenges the admission of evidence relating to his theft of the Bentley, arguing that the only purpose of this evidence was to prove propensity, an improper purpose under the Federal Rules of Evidence. Fed. R. Evid. 404(b). We review a district court's admission of evidence for an abuse of discretion. *United States v. Joseph*, 310 F.3d 975, 978 (7th Cir. 2002). We will reverse an evidentiary ruling only when the record contains no evidence on which the district court rationally could have based its ruling. *United States v. Conley*, 291 F.3d 464, 472 (7th Cir. 2002).

We start with the premise that direct evidence of a crime is almost always admissible against a defendant. *See* Fed. R. Evid. 401, 403 (acting as the primary constraints on the admission of direct evidence). Sometimes, however, the government will seek to introduce evidence that is not direct evidence of charged conduct, but is instead evidence of "other bad acts." In the latter case, Federal Rule of Evidence 404(b) generally bars the admission of other bad acts evidence used to prove a defendant's character. But the fact that a piece of evidence

details a defendant's prior bad act does not preclude the evidence's admission for some other purpose. In fact, prior bad acts may be admissible to prove a defendant's motive, intent, knowledge, preparation, plan, identity, or absence of mistake. Fed. R. Evid. 404(b). When evidence is admitted under Rule 404(b), however, it may only be used for the purpose for which it is explicitly offered; use of the evidence to show propensity is still prohibited. *Id.*

This circuit has also traditionally allowed the admission of evidence under the "inextricable intertwinement" or "intricately related" doctrine. *See United States v. Conner*, 583 F.3d 1011, 1018 (7th Cir. 2009). The inextricable intertwinement doctrine is based on the notion that evidence inextricably intertwined with charged conduct is, by its very terms, not *other* bad acts and therefore, does not implicate Rule 404(b) at all. *United States v. Luster,* 480 F.3d 551, 556 (7th Cir. 2007); *United States v. Simpson*, 479 F.3d 492, 500 (7th Cir. 2007). "In other words, evidence admitted under this doctrine lie[s] outside the purview of the Rule 404(b) character/propensity prohibition, and is not subject to its constraints regarding the manner in which the evidence may be used." *Conner*, 583 F.3d at 1019 (internal quotation marks and citations omitted) (alteration in original).

Even if evidence is initially deemed admissible under any of these three doctrines, however, that evidence must still pass muster under Rule 403's balancing test to actually be admitted against a defendant. *Simpson*, 479 F.3d at 500 (discussing Rule 403's interplay with the

inextricable intertwinement doctrine); *United States v. Jobson*, 102 F.3d 214, 220 n.4 (6th Cir. 1996) (noting that direct evidence is subject only to Rule 401's relevancy requirements and Rule 403's balancing test); Fed. R. Evid. 404(b) Sen. Comm. Report, S. Rep. No. 1277, 93d Cong., 2d Sess., 24 (1974) (explaining that Rule 404 operates in conjunction with Rule 403). To make this determination, a court must weigh whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403. Only if the court determines that Rule 403's balancing test weighs in favor of admission is the disputed evidence then placed before the jury.

The admitted evidence that Jamarkus disputes relates to his theft of the Bentley and his recovery of money from its trunk. Much of this evidence was in the form of witness testimony, including a statement made by Edwards to Taylor. With the exception of Edwards's statement to Taylor, the government successfully sought admission of the contested evidence by arguing that it was inextricably intertwined to Jamarkus's charged perjury conduct.[4] Jamarkus, on the other hand, argued

---

[4] With regard to the statement that Edwards made to Taylor, Jamarkus conflates the argument that it was admitted by way of Rule 404(b)'s exception for evidence of intent with the argument that it was admitted as non-hearsay under Rule 801(d)(2). In fact, the statement was admitted under both Rule 404(b) and under Rule 801(d)(2)(E) as a non-hearsay statement by a co-conspirator in furtherance of the conspiracy.

(continued...)

that this conduct was not inextricably intertwined with his charged perjury, but rather, was evidence of prior bad acts tending only to prove his propensity to commit perjury. We address these contentions now.

We have recently cast doubt on the continuing viability of the inextricable intertwinement doctrine, finding that "[b]ecause almost all evidence admitted under this doctrine is also admissible under Rule 404(b), there is often 'no need to spread the fog of "inextricably intertwined" over [it].'" *Conner*, 583 F.3d at 1019 (*quoting United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 190 (2008)). We again reiterate our doubts about the usefulness of the inextricable intertwinement doctrine, and again emphasize that direct evidence need not be admitted under this doctrine. If evidence is not direct evidence of the crime itself, it is usually propensity evidence simply disguised as inextricable intertwinement evidence, and is therefore improper, at least if not admitted under the constraints of Rule 404(b). *See, e.g.*, *Taylor*, 522 F.3d at 734 ("A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could 'complete the story' or 'inciden-

---

[4] (...continued)

This statement certainly was admitted properly under Rule 801(d)(2)(B), and although that is sufficient, we note that it was also proper under Rule 404(b) because it demonstrated Jamarkus's intent to have Taylor assist him with the theft. And as we will affirm the admissibility of the theft evidence below, we find that the evidence was proper under Rule 404(b) as well. Thus, the statement was properly admitted under either rule.

tally involve' the charged offense or 'explain the circum-stances.'").

We recognize, however, that we do not write on a clean slate. There traditionally have been subtle distinctions between direct evidence of a charged crime, inextricable intertwinement evidence, and Rule 404(b) evidence, *see United States v. Fleming*, 290 F. App'x 946, 948 (7th Cir. 2008) (unpublished); *see also Lane,* 323 F.3d at 579 (explaining that Rule 404(b) is inapplicable where evidence is *either* direct proof of charged conduct *or* inextricably related to charged conduct), but our case law has not often focused on these fine distinctions. We have often lumped together these types of evidence, *see, e.g.*, *United States v. Diaz*, 994 F.2d 393, 394-95 (7th Cir. 1993) ("[W]e have said that [direct] evidence is 'intricately related' to the occurrence of the charged offense . . . ."); *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir. 1991) (affirming the admission of direct evidence under the intricately related doctrine), and this has only served to further cloud the already murky waters of the inextricable intertwinement doctrine.

There is now so much overlap between the theories of admissibility that the inextricable intertwinement doctrine often serves as the basis for admission even when it is unnecessary. Thus, although this fine distinction has traditionally existed, the inextricable intertwinement doctrine has since become overused, vague, and quite unhelpful. To ensure that there are no more doubts about the court's position on this issue—the inextricable intertwinement doctrine has outlived its

usefulness. Henceforth, resort to inextricable intertwinement is unavailable when determining a theory of admissibility.[5]

Turning now to the disputed evidence in this case, the district court proffered two rationales for application of the inextricable intertwinement doctrine to the evidence of Jamarkus's theft of the Bentley and his extrication of money therefrom. The court found both that the evidence completed the story of the perjury and that it explained to the jury Jamarkus's motivation to lie. But we think that resort to inextricable intertwinement in this case was unnecessary. Because the basis for the perjury charge was that Jamarkus denied "having" the car in his garage, his theft of the car and extrication of the money from within were direct evidence of his false testimony. The fact that Jamarkus removed the Bentley from the garage demonstrated that he "had" a Bentley in the garage in the first instance. Therefore, this evidence was properly admitted, albeit as direct evidence rather than inextricable intertwinement evidence.

Even though the district court admitted the evidence under the latter doctrine, however, it makes no practical difference to the outcome of admissibility. Under an abuse of discretion standard of review, as long as the admission was proper, the fact that the rationale for admission may have been blurred matters little. *See*

---

[5] Because our decision overrules our prior line of cases, we have circulated it to the full court as required by our Circuit Rule 40(e). No judge favored a hearing en banc.

*Conley*, 291 F.3d at 472 (noting that evidentiary rulings will be affirmed if there is a rational basis in the record for the district court's finding). The evidence was properly admitted, and any confusion of the proper channel of admissibility is insignificant to that ultimate outcome.

Because we agree with the district court that the challenged evidence was properly admitted, the only remaining question is whether the probative value of that evidence was substantially outweighed by any unfair prejudicial effect on Jamarkus. Jamarkus contends that the district court failed to properly weigh the evidence as required by Rule 403. He argues instead that the court found that *because* the evidence was inextricably intertwined, it was probative to his charged conduct, thus conflating the separate inquiries of admissibility and exclusion.

Although "[t]he balancing of probative value and prejudice is a highly discretionary assessment, and we accord the district court's decision great deference, only disturbing it if no reasonable person could agree with the ruling," *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003), we have previously cautioned district courts to avoid applying the inextricable intertwinement doctrine in a way that circumvents Rule 403's dictates, *cf. United States v. Strong*, 485 F.3d 985, 990 (7th Cir. 2007) (noting that evidence otherwise admissible under the inextricable intertwinement doctrine must still pass muster under Rule 403).

In this case, the district court's assessment of the probative value versus the relative prejudice might have

been better articulated with an eye toward the factors expressed in Rule 403 itself, but this alone does not mean that the court failed to perform the requisite balancing. While the court may have used language appearing to conflate the inquiry in Rule 404 with that of Rule 403, we think the court's ultimate conclusion was correct—the probative value of the evidence was not substantially outweighed by its potential prejudicial effect.

Under similar circumstances, in *United States v. Price*, we explained:

> In light of its probative value, we cannot say that the evidence . . . was substantially outweighed by the danger of unfair prejudice. It is true that the trial judge did not expressly state his reasons in the balancing of probative value and unfair prejudice under Rule 403, which he should have done. We will not, however, presume the wrong reasons, when the correct ones are apparent.

617 F.2d 455, 460 (7th Cir. 1980) (citations omitted). We think that a similar caution and conclusion are also appropriate here. Although the district court might have better explained the rationale behind its Rule 403 conclusion, it is evident to us that the court's ultimate reason for admitting the evidence was that the probative value was not significantly outweighed by the prejudicial impact.

And though we certainly understand the reason for Jamarkus's assertion that the district court confused the inquiry, we ultimately cannot agree that this affected

the outcome. The evidence in question was necessary to prove the falsity of Jamarkus's grand jury testimony. It proved his intentional misrepresentation, and therefore, had great probative value.

In contrast, the prejudice to Jamarkus, although present, was significantly less. Certainly, there was prejudice in the sense that the evidence tended to show Jamarkus's guilt. But that is not the prejudice with which Rule 403 is concerned. *See United States v. Nolan*, 910 F.2d 1553, 1558-59 (7th Cir. 1990).

Instead, Rule 403 seeks to prevent the prejudice resulting from improper use of the evidence. Fed. R. Evid. 403, Advisory Comm. Note. In this case, we agree with Jamarkus that there was some risk that the jury would misuse the evidence of the theft to determine guilt for the crime of perjury. But to warrant exclusion under Rule 403, the "probative value [of evidence] must be insignificant compared to its inflammatory nature so that the evidence *unfairly* prejudices the defendant." *United States v. Gougis,* 432 F.3d 735, 643 (7th Cir. 2005) (internal quotation marks omitted).

Because we are more prone to "tolerate some risk of prejudice" when the evidence at stake is significantly probative, *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008), we find that the evidence here was properly admitted. Any lack of explanation on the district court's part is excusable for the reasons stated above. Accordingly, Jamarkus's argument that the admission of evidence was improper fails.

### III. CONCLUSION

Because there was ample evidence to support the finding that Jamarkus perjured himself with regard to his possession of the Bentley, his appeal in that regard is without merit. Additionally, the admission of the evidence relating to Jamarkus's theft of the car was direct evidence of his charged perjury conduct and its probative value was not substantially outweighed by any risk of unfair prejudice. For these reasons, Jamarkus's conviction is AFFIRMED.