# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1960

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN BOONE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 07 CR 5—**Ruben Castillo**, *Judge.*

ARGUED JANUARY 14, 2010—DECIDED DECEMBER 27, 2010

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* On April 3, 2008, Steven Boone was indicted along with Alderman Arenda Troutman, on a number of charges relating to a political corruption scheme run out of her aldermanic office, in which housing developers were forced to pay bribes to her office in order to secure the alderman's support. Prior to trial, Troutman pled guilty to two counts of the 15-count indictment, and the government proceeded to

trial against Boone on four of the remaining counts: Count IV—mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; Counts V and VI—bribery, in violation of 18 U.S.C. § 666(a)(1)(B); and Count XIV—making false statements to an agent of the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. § 1001(a)(2). The jury convicted Boone on the mail fraud count, but acquitted him on the bribery charges. It also convicted him of one count of making false statements to the FBI. Boone appeals only his conviction for mail fraud.

The conviction for mail fraud in this case involved a "pay-to-play" scheme. Boone was the housing coordinator in Troutman's aldermanic office, and he and Troutman engaged in a scheme that deprived the residents of the 20th Ward of the honest services of their Alderman. Pursuant to that scheme, developers who wanted to build or rehabilitate property in the 20th Ward were required to pay a bribe to Troutman's office in order to gain support that they needed to proceed, such as letters of support from her for zoning changes, alley access, and curb cutting. Although Troutman was the central person in the scheme, Boone was a necessary part of it through his role as housing coordinator.

We note that recently the Supreme Court in *Skilling v. United States*, ___ U.S. ___, 130 S. Ct. 2896 (2010), limited the use of the theft of honest services statute. The Court recognized that, read broadly, § 1346 would raise due process concerns underlying the vagueness doctrine. *Id.* at 2931. The Court analyzed the history of the honest services cases, and noted that the " 'vast majority' "

of the cases involved offenders who participated in bribery or kickback schemes in violation of a fiduciary duty. *Id.* at 2930. The Court concluded that Congress intended § 1346 to at least reach those types of cases. *Id.* at 2931. Accordingly, the Court held that in order to avoid vagueness problems, § 1346 must be read as criminalizing *only* bribery and kickback schemes. *Id.* at 2932-33.

That holding limiting the scope of § 1346 does not impact the conviction in this case, and the parties do not argue otherwise. The present case involves precisely the type of claim that the Court retained. The allegations were that a payment was made in order to obtain the services that the alderman's office is supposed to provide. Thus, the allegations underlying the honest services conviction in this case involved the type of bribery conduct that the Court preserved in *Skilling*, and which constitutes criminal conduct under § 1346.

In addition to the mail fraud charge, the government also attempted to prove two counts of making false statements to the FBI. One count centered on Boone's denial to the FBI that he had collected any donations for Troutman's fundraising activities. At trial, Boone attempted to demonstrate that he was not in charge of the financial bookkeeping and that any money submitted to the office was placed unopened in the inbox for the person in charge of finances. The jury acquitted Boone on that charge. The second false statement charge related to Boone's denial that he had any knowledge as to a property at 6417 South Maryland Street

involved in Troutman's scheme. The government introduced substantial testimony regarding the dealings between Troutman and others as to that property, and Boone's involvement in the events. The jury ultimately convicted Boone of making a false statement in denying knowledge of that property. Boone does not appeal that conviction.

As to the mail fraud charge, Boone argues that the district court erred in allowing testimony of shakedowns which did not involve Boone and which occurred after the mailing that formed the basis for the mail fraud charge. He also argues that the court erred in allowing expansive testimony as to the property at 6417 South Maryland Street. Although Boone acknowledges that some evidence as to that property could be introduced to prove the false statement charge, he argues that the court should have limited it to events of which Boone had personal knowledge.

I.

We turn, then, to the facts presented at trial concerning the victims of the scheme, beginning with Douglas Greer. Greer owned property located at 5843 South State Street near Troutman's aldermanic office, and he began renovating that property without obtaining the required permit from the City. In Spring 2002, Boone saw Greer renovating that property, and approached Greer, identifying himself as Alderman Troutman's assistant. Boone informed Greer that it was illegal to renovate a building without first obtaining a permit, but assured him that

if Greer was willing to "take care of the office" then he could proceed without the permit. Greer understood that as a request for payment of a bribe to the office, but he chose not to pay it at that time. Within a week, Boone returned to the property with the police and attempted to have Greer arrested. The police, however, refused to arrest Greer for the failure to obtain a permit. A few days after that incident, Greer went to Troutman's office and spoke with Boone, who informed him that for a $10,000 cash payment he would be allowed to proceed without a permit. Greer negotiated that amount down to $8,000, and paid it out of drug proceeds he had obtained as a drug dealer. He later received a receipt from Troutman's office for a "campaign contribution" in an amount significantly less than the $8,000 he had provided. After paying the bribe, Greer was able to proceed with the renovation of the property unhindered and without any permit.

Boone requested a second payment from Greer in Spring 2003. At that time, Greer had completed the renovation of the property, and intended to use the first floor as a hair salon. He discovered, however, that it was necessary to get the property rezoned in order to use it for that commercial purpose. In order to obtain that rezoning, Greer testified that he needed a letter of support from the alderman's office. Greer met with Troutman, Troutman's sister and brother, and Boone at the office. Boone then stated that in order to obtain the letter Greer would have to pay $15,000 to the office. Greer again negotiated a lower amount, this time $12,000, and subsequently made two cash payments of

$6,000 each. The day after making the second payment, Greer retrieved the letter of support from the office.

As part of the procedure for obtaining that rezoning, Greer sent a mailing to the neighbors in the area informing them of the request. That mailing and the scheme that it furthered forms the basis for the mail fraud conviction.

The government also introduced evidence of other persons who similarly were required to pay bribes to the office in order to obtain the services that the alderman is supposed to provide. In August 2004, Kalpana Plomin sought help from the alderman's office. She had started a business called Homes with Heart, a non-profit organization which sought to renovate dilapidated buildings to provide affordable housing for low-income residents. She was interested in purchasing a large building at 4758 South Marshfield and converting it to a 12-unit apartment building. The property was zoned for use as a single family home or two-flat, and therefore she sought Troutman's support for a zoning change before she proceeded with the acquisition of the property. She met with Alderman Troutman and approximately 6 or 7 other persons in Troutman's office, explaining her request. She did not identify Boone as one of the individuals that she remembered at that meeting. At the end of the meeting, Troutman expressed enthusiasm for the project, and told Plomin that a member of her staff, Reverend Gregory Hall, would escort her from the office and explain the "political things" that Plomin would need to do in order to obtain

the support. Hall informed Plomin that she had to make a campaign contribution of $1,500 in order to obtain a letter of support from Troutman. Plomin ultimately decided against paying that money, and she did not obtain the letter of support. As a result, Homes with Heart did not obtain that property for its low-income housing.

In a similar shakedown, in December 2003, James Pattison sought a zoning change and alley access for a property he was developing on Michigan Avenue. He met with Troutman and a man whose name he could not recall in order to seek Troutman's support. At that meeting, Troutman handed Pattison a stack of tickets for a fundraising event for her campaign. Pattison stated that he would do his best to sell the tickets, and Troutman told him that he had already bought them. Pattison understood that to mean "that if I wanted to get what I needed to get done for my building, I was going to have to purchase these tickets." There were 50 tickets at $100 each, costing him a total of $5,000. Pattison issued three checks totaling $5,000 after being instructed by someone in Troutman's office as to how to fill out the checks. Once the checks were cashed, Pattison received the letter of support from Troutman.

Finally, the government introduced testimony regarding a property located at 6417 South Maryland Street, which formed the basis for the conviction for making false statements to the FBI. At trial, the government introduced substantial testimony regarding the dealings concerning the alderman's office and that Mary-

land property between December 2003 and November 2005. The testimony indicated that the City had begun demolition proceedings on the Maryland building. Troutman sought to purchase the property with her then-boyfriend Donnell Jehan, a leader in the Black Disciples street gang, but wanted his identity concealed in the transaction. In December 2003, Boone approached Andy Roman, a real estate developer in the area, and asked him to come to Troutman's office for a meeting. At that meeting, Troutman and Boone asked Roman to purchase the Maryland building and then resell it to Troutman and an "undisclosed partner." To facilitate the transaction, Troutman assured Roman that she would write a letter asking the City to vacate the demolition order on the building.

Roman agreed to proceed, and he received the letter of support from Troutman which he believed was faxed to him by Boone. Roman closed on the property, and subsequently prepared a sales contract with a blank "purchaser" line that Troutman could complete later. Jehan began renovating the building before that sales contract was executed, but then fled the city when law enforcement attempted to arrest him for drug trafficking, and therefore the sale to Troutman was never completed.

Roman, then, remained in ownership of a property he did not want, and the court that had issued the original demolition order began fining him for failure to complete the renovations. To alleviate that problem, Troutman asked Andy Pacult, another real estate developer, to complete some repairs on the building. Pacult

paid his construction crew approximately $5,600 for the repair work, but received no money from Troutman for the work. He testified that he did the repair work for free because it was obvious to him that he had to do so in order to get Troutman's support in his future real estate dealings.

On Troutman's instruction, Pacult then falsely informed the court that he intended to buy the property. Roman eventually sold the property to a third party for a profit. Troutman then demanded $20,000 in cash from Roman for the renovations that she and Jehan had made to the building. Roman ultimately complied with that request in order to maintain a good working relationship with her. He provided a $5,000 payment in cash in April 2005. Troutman and Boone called him repeatedly after that payment seeking the additional $15,000 Troutman had demanded. After those calls, Roman left a $10,000 cash payment in an envelope at his office to be picked up, ostensibly by Boone although Roman testified that he could not be sure if Boone was the one who retrieved it. Troutman personally collected the final payment of $5,000. Troutman never paid any of that money to Pacult for the repairs he made on her behalf.

Testimony at trial indicated that Boone's duties in the office included serving as Troutman's housing co-ordinator and working on real estate development issues. In that capacity, one of Boone's jobs was to issue the aforementioned letters of support for the alderman, and those letters bore his name as the contact person

should the recipients have any concerns, and also bore both his and Troutman's initials.

## II.

At trial, Boone objected to the introduction of evidence regarding Plomin and Pattison, and to some of the evidence regarding the Maryland property. The trial court denied those motions, and Boone now argues that the district court abused its discretion in allowing the government to offer testimony regarding Plomin and Pattison. Boone emphasizes that he was not present during the interactions with Plomin and Pattison. Moreover, because those incidents occurred after the mailing, he argues that they do nothing to establish that the mailing was in furtherance of the scheme. Accordingly, he argues that the evidence was unfairly prejudicial and confusing to the jury.

We review only for abuse of discretion the district court's decision to admit evidence, and will reverse and order a new trial only if any evidentiary errors are not harmless. *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010); *United States v. Useni*, 516 F.3d 634, 651-52 (7th Cir. 2008); *United States v. Owens*, 424 F.3d 649, 653 (7th Cir. 2005). "Indeed, we afford 'great deference to the trial court's determination of the admissibility of evidence because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding.'" *United States v. Ryan*, 213 F.3d

347, 350 (7th Cir. 2000) quoting *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998). Boone argues that the court abused its discretion because the evidence was not relevant, in that it did not make it more likely that the mailing occurred in April 2003, nor did it shed light on whether the mailing was in furtherance of the alleged scheme. In the alternative, Boone argues that even if relevant, the evidence was nevertheless unduly prejudicial and confusing and therefore should have been excluded under Federal Rule of Evidence 403.

In considering the admissibility of the evidence, the district court began by rebuking the defense counsel for filing the motion on the eve of trial although counsel was aware of the possibility of such testimony for quite some time. The court nevertheless considered the request and ultimately denied it. The court held that it was a classic situation of a scheme that involved other uncharged crimes that were inextricably inter-twined with the charged offense. Although the district court recognized that the admission of such evidence prejudiced Boone, the court concluded that it was not undue prejudice under Rule 403, and the court further expressed its willingness to give a limiting instruction and invited the defense to propose such an instruction.

The government argues for affirmance on the same basis, contending that the evidence regarding Plomin and Pattison was inextricably intertwined with the scheme and therefore properly admitted on that basis. We have long criticized the admissibility of evidence based on the inextricably intertwined doctrine. That

doctrine allowed evidence of uncharged acts to be introduced if that evidence was inextricably intertwined with the charged offense, such as where: it was necessary to provide the jury with a complete story of the crime on trial; its absence would create a chronological or conceptual void in the narrative of the charged offense; or it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of the charged offense. *United States v. Simpson*, 479 F.3d 492, 500-01 (7th Cir. 2007); *United States v. Lane*, 323 F.3d 568, 580 (7th Cir. 2003). We repeatedly noted, however, that the doctrine was "unhelpfully vague," and was often used as a basis to admit evidence that was more properly admissible either as direct evidence or as evidence under Rule 404(b). *United States v. Conner*, 583 F.3d 1011, 1019 (7th Cir. 2009); *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008). We reiterated those concerns in our recent decision in *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010), characterizing the inextricable intertwinement doctrine as "overused, vague and quite unhelpful." We concluded that the doctrine had outlived its usefulness, and that "[h]enceforth, resort to inextricable intertwinement is unavailable when determining a theory of admissibility." *Id.*

The present case illustrates the concerns that caused us in *Gorman* to reject the inextricable intertwinement doctrine. Although the evidence in this case was apparently admitted based on that doctrine, it more properly should have come in as direct evidence, and as evidence of intent under Federal Rules of Evi-

dence 404(b). *See Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 13-14 (1st Cir. 2000) (noting that we can affirm the admission of evidence on any proper basis regardless of whether that was the ground relied upon by the district court); *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) (same).

In order to prove mail fraud, the government was required to establish: (1) that Boone participated in a scheme to defraud; (2) that he did so knowingly and with the intent to defraud; and (3) that Boone used or caused the use of the mails in furtherance of the scheme. *United States v. Boisture*, 563 F.3d 295, 298 (7th Cir. 2009); *United States v. Thyfault*, 579 F.3d 748, 751 (7th Cir. 2009). The challenged evidence was relevant to prove both the scheme itself and to prove that Boone participated in the scheme knowingly and with intent to defraud.

Boone argues at length that the incidents regarding Plomin and Pattison occurred after the "mailing," and concludes that the incidents therefore should not have been admissible. Boone argues that the government is limited by the date of the mailing, and cannot produce evidence remote in time from that occurrence. The mailing, however, merely provides the prerequisite to federal jurisdiction over the scheme to defraud. The government is entitled to prove the scheme itself, and that proof is not bounded by the timing of the mailing.

For instance, in *United States v. Lanas*, 324 F.3d 894 (7th Cir. 2003), the government introduced evidence of a scheme spanning six years, in which Richard

Hendershot, a claims adjuster, hired private investigators to conduct surveillance on claimants, and demanded that those investigators provide a cash kickback to him for each job. The scheme was in effect from 1988 to 1994, and involved six private investigation or security firms. *Id.* at 898. In addition, the government introduced evidence that Hendershot solicited kickbacks from a law firm but that the attempt was unsuccessful. *Id.* Clifford Lanas, one of the investigators who provided kickbacks, and James Battista, the "bagman" who collected the cash payments, were charged with Hendershot. *Id.* The mailings alleged in the indictment all occurred in July 1994, at the end of the alleged scheme. *Id.* On appeal, the defendants argued that the government should not have been allowed to introduce uncharged other acts evidence unrelated to the dealings between the co-defendants, and which were not factually or temporally related. *Id.* at 900. Specifically, they argued that the court erred in allowing evidence relating to the law firm and to two other vendors. *Id.* We affirmed the convictions and made clear that evidence related to those vendors and the law firm could be admitted, not under Rule 404(b) as other acts evidence, but as direct proof of the overall scheme itself. *Id.* at 901. We noted that the defendants' argument appeared to be based on the misperception that the scope of a mail fraud scheme is defined by the mailing charged in the indictment and that the offense was thereby limited to the portion of the scheme pertaining to that mailing. *Id.* We rejected that notion, emphasizing that "a mailing in furtherance of a scheme to defraud is simply

the element that confers federal jurisdiction under the mail fraud statute; but a fraud scheme can produce pro-ceeds long before the act that ultimately triggers juris-diction." *Id.*, citing *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). Therefore, even acts that occurred well before the July 1994 mailings, and which involved different participants in the scheme, could be introduced to prove the overarching scheme.

Similarly, in *Schmuck v. United States*, 489 U.S. 705 (1989), the Supreme Court affirmed a mail fraud conviction in which the mailing occurred well after the fraud was otherwise completed. In *Schmuck*, the defendant pur-chased used cars, rolled back the odometers, and then resold them with the lower odometer readings to unwitting car dealers. *Id.* at 707. When those dealers later resold the cars to customers, the dealer would submit a title-application form to the Wisconsin Depart-ment of Transportation, and that submission was the mailing that was relied upon for the mail fraud charge. *Id.* The Court upheld the conviction, reasoning that "the use of the mails need not be an essential element of the scheme. . . . It is sufficient for the mailing to be 'incident to an essential part of the scheme,' . . . or 'a step in the plot' . . . ." *Id.* at 710-11 [citations omitted]. Both *Lanas* and *Schmuck*, then, make clear that the timing of the mailing does not delineate the scope of the scheme.

Boone attempts to distinguish those cases in that they involved evidence of acts that occurred prior to the mailing, whereas in the present case Boone challenges the introduction of evidence regarding conduct subse-

quent to the mailing. Boone presents no case support or rationale as to why that distinction is of any import. The fortuity of the timing of the mailing—whether it occurred at the start or the conclusion of a fraudulent scheme—cannot be the determining factor as to whether the government can produce evidence of the scheme. Such a rule would make no sense. The government must prove both the existence of a scheme and that there was a mailing in furtherance of that scheme. The mailing is a jurisdictional prerequisite which must be satisfied in order to invoke federal criminal prosecution, but it does not constitute an endpoint beyond which the government may not provide evidence of the scheme. The government is entitled to establish the scheme and can rely on evidence that occurred before and after the mailing in order to do so.

The government takes the opposite approach, essentially arguing on appeal that its use of such evidence is unbounded, but that is equally problematic. There are limits on the extent to which the government may introduce evidence of the scheme. The district court must consider whether such evidence survives the Rule 403 balancing test of probative value and prejudice. As evidence regarding the scheme moves farther, both temporally and in terms of the defendant's involvement, from the defendant's actions that form the crux of the criminal claim, that balance may well tip in favor of exclusion. Moreover, the definition of the scheme itself is a limiting principle, in that only evidence of the same scheme as opposed to a related or distinct scheme, is admissible. In this case, the government limited at trial

the evidence that it chose to present once Troutman was removed from the case, but it still presented evidence involving meetings and shakedowns that did not involve Boone directly. Because of the defense that Boone chose to present, however, and the nature of the scheme that the government alleged, that evidence was properly admitted in this case.

The scheme alleged in this case did not have Boone at its center, but rather was a scheme by Troutman to seek money from those who sought the services of her office, particularly the housing-related services. Therefore, proof of the scheme would necessarily involve evidence regarding Troutman and others in the office, in addition to evidence of Boone's personal involvement. The evidence regarding Plomin and Pattison was significant in establishing that scheme. The allegations were that in order to obtain the letters of support, the victims of the scheme would have to make "donations" to Troutman's office. Plomin's testimony provided a critical component of that scheme that could not be demonstrated by the other evidence, which was that the requested financial payment was in fact a quid pro quo for the services, and not merely a request for support from Troutman. That component was necessary to establish the basis for the fraud charge, which was the theft of honest services. The interaction with Plomin was the only one presented by the government in which the victim chose not to make the payment, and Plomin in fact did not receive the letter of support. Because that evidence was directly relevant to establish a critical component of the scheme, it was admissible as direct evidence of the offense.

The evidence regarding Plomin and Pattison also served to establish an element of the offense—Boone's knowledge. Recognizing that Boone's defense was in part to deny his knowledge of the scheme, the district court provided the ostrich instruction to the jury, instructing them that:

> When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

Transcript of Proceedings, Vol. 5, p. 752 (07 CR 5-2, September 23, 2008). Therefore, the government could prove knowledge by demonstrating that Boone must have known of the scheme to defraud. Moreover, because "[a] person's state of mind is rarely susceptible of proof by direct evidence, . . . specific intent to defraud may be, and most often is, inferred from the

totality of the circumstances, including indirect and circumstantial evidence." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009); *see also United States v. Ryan*, 213 F.3d 347, 350 (7th Cir. 2000) (noting that intent to defraud can be established by circumstantial evidence and the inferences drawn from the scheme itself).

Accordingly, evidence of the blatant and open nature of the requests for payments, and of the large number of individuals in the office who were participants in the scheme, was relevant to demonstrate that Boone must have known of the scheme. Regarding Plomin, her testimony was that she met with 6 or 7 persons in Troutman's office seeking the letter of support, and that in the presence of those persons Troutman declared that Hall would explain the "political thing" that she would need to do in order to obtain the support. The "political thing" required of her was the payment of the $1,500. Similarly, the Pattison testimony established that Troutman and another person requested a payment in only the second meeting with Pattison, informing Pattison that he had "already bought" the fundraising tickets that they handed to him. That meeting and conversation occurred in a conference area outside of Troutman's private office, near a reception or assistance desk, and took place in the presence of another person from Pattison's office in addition to Pattison. Finally, Pattison testified that he was instructed by someone in Troutman's office as to how to fill out the checks. That evidence again established that the requests for money were not made in a secretive manner, but rather

that such business was openly conducted in the presence of others in the office, and that such requests were made in the first or second contacts with the victims seeking the letters of support. That latter point is important because Boone argued at trial that it was unbelievable that Boone would approach Greer, a person he did not know, and request a bribe at that first meeting. Evidence that similarly-bold requests were made by Troutman and members of her office to other persons at their initial contacts with the office was relevant to demonstrate the manner in which the scheme operated, and to establish that Boone, as housing coordinator, had knowledge of that scheme and acted in furtherance of it.

The only other evidence challenged by Boone related to the property at 6417 South Maryland Street. That property formed the basis for the charge of making a false statement to the FBI. The false statement alleged was the claim by Boone that he had no knowledge regarding the Maryland property. The government was entitled to introduce evidence of the extensive dealings of Troutman and her office with that property in order to demonstrate that his statement had to have been false. Even evidence unrelated to Boone directly was relevant in that it showed that the dealings regarding that property were not routine, but were extensive and unusual in that they involved Troutman's efforts to purchase that property. That evidence, paired with Boone's direct involvement in matters relating to the property, was relevant to establish that he knew the statement was false when he made it to the FBI. Accordingly, this challenge is without merit.

Finally, Boone argues that even if relevant, the evidence should have been excluded under Federal Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice. We have already discussed the probative value of the evidence, and particularly noted that the contested evidence was necessary to establish that the "requests" for money were in fact demands, and that the scheme was conducted in an open and blatant manner. The trial court concluded that the Rule 403 balancing weighed in favor of admission, and Boone has given us no reason to find an abuse of discretion in that determination. The decision of the district court is AFFIRMED.