# In the
# United States Court of Appeals
## For the Seventh Circuit

—————————

Nos. 01-3248, 01-3491 & 01-3580

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CLIFFORD J. LANAS, RICHARD A. HENDERSHOT,
and JAMES A. BATTISTA,

*Defendants-Appellants.*

—————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 529—**Rebecca R. Pallmeyer**, *Judge.*

—————————

ARGUED DECEMBER 4, 2002—DECIDED APRIL 4, 2003

—————————

Before FLAUM, *Chief Judge*, and COFFEY and DIANE P.
WOOD, *Circuit Judges.*

FLAUM, *Chief Judge.* Richard Hendershot, James Battista,
and Clifford Lanas were convicted on mail fraud charges
stemming from a scheme to defraud Hendershot's former
employer, Alexsis Risk Management, Inc. ("Alexsis"), of
its intangible right to his honest services. *See* 18 U.S.C.
§§ 1341, 1346. The defendants now challenge their convic-
tions and sentences on numerous grounds. We affirm in all
respects.

## I. Background

We provide just a general description of the facts here; where additional facts are relevant to particular arguments, we mention them later. Alexsis is engaged in the business of third-party claims administration, handling mostly workers' compensation claims for large corporations. Defendant Hendershot worked in Alexsis's Chicago office from 1988 to 1994 as a claims adjuster. In this capacity he was responsible for evaluating workers' compensation claims filed against Alexsis clients and determining whether and to what extent the claims were compensable. This sometimes entailed hiring outside vendors, such as private investigators, to conduct surveillance on a given claimant.

The charges in this case stemmed from a scheme made possible by the free hand Hendershot had in selecting the vendors to perform Alexsis work. Basically, the scheme worked like this: Hendershot sent surveillance work to a number of vendors who in exchange agreed to give him a cash kickback for each job. Per agreement with Hendershot, these vendors oftentimes billed for two investigators when only one was used or billed for services that were never performed at all. Also, as an additional ploy, Hendershot frequently hired multiple investigators to perform surveillance on the same claimant. Then, Hendershot approved the invoices submitted by the vendors and sent the information necessary to process payment to Alexsis's headquarters in Michigan. Alexsis, totally unaware of the scam, cut and mailed checks from its headquarters; the vendors then deposited the checks while withdrawing enough cash to pay Hendershot the agreed-upon kickback.

According to Count 1 of the three-count indictment, from 1988 to 1994, Hendershot received kickbacks from the following six private investigation or security firms: John Herley and Associates, Thomas Herley and Associates,

Professional Protection Services ("PPS"), Megco, Inc., Three Star Detective and Security Agency ("Three Star Detective Agency"), and Park Investigations and Detective Agency ("Park Investigations"). Count 1 also alleged that Hendershot tried to solicit kickbacks from the law firm of Stevenson, Rusin & Friedman ("the Rusin law firm"), though his attempts were ultimately unsuccessful. Defendant Battista, a political associate of Hendershot, was alleged to be the "bagman"—collecting the kickbacks for Hendershot while retaining a portion for himself—with respect to all the named vendors except John and Thomas Herley. Defendant Lanas was the owner of both Three Star Detective Agency and Park Investigations.

Counts 2 and 3 incorporated by reference the description of the scheme in Count 1, but each count listed a different mailing that was allegedly used to further the scheme. Count 1, which charged only Hendershot, alleged the mailing of an Alexsis check to Thomas Herley on July 7, 1994. Count 2 also charged Hendershot alone and claimed that a second Alexsis check was mailed to Thomas Herley on July 7, 1994. Finally, Count 3 charged all three defendants and alleged the mailing of an Alexsis check to Park Investigations on July 22, 1994.

Prior to trial Battista and Lanas moved to sever Counts 1 and 2 from Count 3, claiming that the scheme to defraud as it pertained to Lanas's Three Star Detective Agency and Park Investigations was separate from the scheme as it pertained to the other vendors named in the indictment. In addition all three defendants moved to strike as surplusage any references to transactions not involving Lanas or Thomas Herley—the vendors alleged to have received the mailings charged in the respective counts. The district court, however, agreed with the government that the indictment recited a single overarching scheme to defraud, which was not limited to the mailings specifically identified in the indictment, and so denied the motions.

The case proceeded to a joint trial, after which the jury found the defendants guilty as charged. Though the trial concluded in March 2000 and the presentence investigation reports were filed four months later, the defendants were not sentenced until August and September 2001. Still, the district court relied on the 1998 version of the Sentencing Guidelines, which gives courts discretion "in the atypical case" to sentence a defendant under a guideline other than the one referenced in the Statutory Index. Then, after determining that the commercial bribery and kickbacks guideline, U.S.S.G. § 2B4.1, was a better fit than the fraud and deceit guideline, *id.* § 2F1.1, the court sentenced the defendants as follows: Hendershot to 48 months', Battista to 27 months', and Lanas to 5 months' imprisonment. In addition all three defendants were ordered to serve 36 months of supervised release and to pay $233,720, $162,300, and $39,900 in restitution, respectively.

## II. ANALYSIS

### A. Joinder

The defendants claim on appeal that they should not have been joined in a single indictment because they were not "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Whether there was misjoinder under Rule 8 is an issue we review *de novo. United States v. Todosijevic*, 161 F.3d 479, 483 (7th Cir. 1998). Further, in assessing whether joinder was proper, we look solely to the face of the indictment and not to the evidence adduced later at trial. *United States v. Alexander*, 135 F.3d 470, 475 (7th Cir. 1998).

We have interpreted the language "same series of acts or transactions" to mean "acts or transactions that are pursuant to a common plan or common scheme." *Todosijevic*,

161 F.3d at 484. The defendants maintain that the transactions involved here were not part of a common plan or scheme because "the evidence at trial demonstrated the evidentiary and temporal connections of the various 'offenses' listed in the indictment . . . ranged from moderate to quite slim." But as we have already said, whether there was misjoinder under Rule 8 is determined by looking solely at the allegations in the indictment; it is thus irrelevant what was shown by the proof at trial. *Alexander*, 135 F.3d at 475. And the allegations in this indictment demonstrate that joinder was proper. Each count recites facts that establish one unified scheme to defraud the same victim (Alexsis) through (1) the solicitation and receipt of kickbacks by Hendershot and Battista, (2) fraudulent tactics on the part of the six vendors named in the indictment, such as over-billing and billing for services that were never performed, and (3) Hendershot's hiring of each of the six vendors to conduct surveillance on the same claimant. *See Todosijevic*, 161 F.3d at 484 (joinder proper because indictment set forth a "joint, systematic, integrated fraudulent venture on the part of each of the defendant[s] designed to defraud creditors"). Hendershot was at the core of the scheme, and Battista was involved in every transaction except for those pertaining to John and Thomas Herley. Lanas's involvement was more minimal, but this does not, as the defendants would have us believe, negate the existence of a single scheme; all it means is that Lanas's liability is limited to the extent of his participation in the scheme. *See United States v. Polichemi*, 219 F.3d 698, 706 (7th Cir. 2000) (single wire fraud scheme despite fact that each participant's role varied from transaction to transaction).

The defendants also contend that Count 3 was misjoined with Counts 1 and 2 under Fed. R. Crim. P. 8(a), which permits joinder of offenses if they "are of the same or similar character or are based . . . on two or more acts or

transactions connected together or constituting parts of a common scheme or plan." This argument is a nonstarter—one, because the indictment does allege a common scheme or plan, and two, because the defendants concede in their appeal brief that all three counts are "the same or similar in type." Despite this concession the defendants seem to believe that the joinder can still be deemed improper because the "overall temporal proximity between [the offenses] was slight." But the case the defendants cite in support of their position, *United States v. Coleman*, 22 F.3d 126 (7th Cir. 1994), holds precisely the opposite. According to *Coleman*, "the similarity of character of different offenses does not significantly depend on their separation in time," *id.* at 133, so counts of like class may be joined even if they are not temporally or evidentially related. *Id.* at 133-34; *accord Alexander*, 135 F.3d at 476.

Finally, to the extent the defendants are claiming that the district court should have severed their trials under Fed. R. Crim. P. 14, their argument fails. *See United States v. Rollins*, 301 F.3d 511, 517 (7th Cir. 2002) (even when joinder under Rule 8 is proper, Rule 14 authorizes district court to grant severance when it appears that defendant will suffer prejudice by joinder of either offenses or defendants). The defendants argue, in a rather conclusory manner, that they were prejudiced by the "spillover" effect of having the charges tried together. But the district court instructed the jury to consider the evidence as to each defendant and each count separately, and we agree with the government that this was not such a complicated case that the jury would have difficulty following the instruction. *See United States v. McClurge*, 311 F.3d 866, 873 (7th Cir. 2002) (instruction directing jury to give separate consideration to each defendant was sufficient to cure any possibility of prejudice). Moreover, the defendants' claim of prejudice is further undercut by the fact that much of the evidence admitted at their joint trial would have been

admissible against them in separate trials as well. *See United States v. Adeniji*, 221 F.3d 1020, 1027 (7th Cir. 2000) (evidence of one participant's actions in furtherance of a mail fraud scheme is admissible against other participants in that scheme).

### B. Evidentiary Issues

Relying on *Kotteakos v. United States*, 328 U.S. 750 (1946), the defendants contend that there was a fatal variance between the allegations in the indictment "that there was a single conspiracy and the proof at trial of multiple schemes/conspiracies with no connection to each other." This argument, which we treat as a challenge to the sufficiency of the evidence, *Polichemi*, 219 F.3d at 706, fails for two reasons. First, the defendants were not even charged with conspiracy, which is a distinct offense, having distinct elements, from mail fraud. *Adeniji*, 221 F.3d at 1027; *see also United States v. Neely*, 980 F.2d 1074, 1089-90 (7th Cir. 1992) (rejecting claim of prejudicial variance between indictment's allegation of a "single conspiracy" and the proof at trial, which allegedly established "multiple schemes," because defendant raising the challenge was never charged or convicted of conspiracy). Second, the evidence at trial proved exactly what the indictment alleged: a single scheme to defraud Alexsis through the solicitation and receipt of kickbacks by Hendershot and Battista from vendors such as Lanas. The defendants again make much of the fact that each participant's role varied from transaction to transaction and further assert that many of the various participants did not even know each other, but this is all irrelevant so long as the evidence established each defendant's own knowing participation in the scheme, which it did. *See Adeniji*, 221 F.3d at 1026; *Polichemi*, 219 F.3d at 706.

The defendants also contend that the district court erred under Fed. R. Evid. 404(b) in admitting "uncharged, other acts evidence"—specifically, the evidence relating to the Rusin law firm, PPS, and Megco. Because the defendants did not raise this issue below, our review is for plain error only, *United States v. Graham*, 315 F.3d 777, 782 (7th Cir. 2003), and we find no such error. The defendants' argument appears to be based on their belief that the scope of a mail fraud scheme is limited by the mailings that are specifically charged in the indictment; so in this case, since the indictment only charged mailings to Thomas Herley and Lanas, the offense is limited to the portion of the scheme pertaining to them alone. This is wrong, however, because a mailing in furtherance of a scheme to defraud is simply the element that confers federal jurisdiction under the mail fraud statute; but a fraud scheme can produce proceeds long before the act that ultimately triggers jurisdiction. *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). As we have already said, the indictment in this case set forth one overarching scheme to defraud. The evidence relating to the Rusin law firm, PPS, and Megco was not Rule 404(b) evidence at all but was properly admitted as proof of that overall scheme.

The defendants' last challenge to the evidence is that it was insufficient to prove that the three mailings charged in the indictment were in furtherance of the scheme to defraud. First, the defendants claim that the mailings, all of which occurred in July 1994, could not have been in furtherance of the scheme because Hendershot had left Alexsis by that time. It is true that one of the government's witnesses testified that Hendershot stopped working for Alexsis in May 1994. But other evidence showed that Hendershot's resignation letter was actually dated July 25, 1994, and his effective termination date was not until August 5. We will overturn a verdict only if no rational trier of fact could have found the defendant guilty, *Graham*, 315

F.3d at 781, and here, based on the date of Hendershot's resignation letter and his effective termination date, the jury could easily have found that Hendershot was still at Alexsis (and still soliciting and receiving kickbacks) at the time of the July 1994 mailings.

The defendants challenge the proof as to Count 3 on an additional ground—that there was insufficient evidence to show that the July 22, 1994, mailing to Park Investigations was in furtherance of the fraud scheme because there was no proof that Hendershot or Battista received any kickback out of that mailing. On this point the government offered the testimony of Richard Lantini, an employee of Lanas's Three Star Detective Agency and part-owner of Park Investigations. Lantini introduced Lanas to Battista in 1993, and later, once Lanas had agreed to participate in the kickback scheme, Lantini was the one who went to Battista's home to pay him the kickback for each job. Lantini never paid Hendershot directly, but Hendershot was named as the claims adjuster on almost all of the invoices. Further, Lantini testified that Battista told him that half of the money was going to Hendershot.

In April 1994 Lantini was convicted on a federal drug charge. According to Lantini's testimony, before he was taken into custody, Lanas told him that he would "be taking care of everything at the business. And any money that would be coming . . . he would continue to put it in the bank, and . . . he would take care of the payments to Mr. Battista." Then, in July 1994 after Lantini was already in custody, he and Lanas had a phone conversation during which Lanas stated that "he was taking care of everything and he was meeting with Mr. Battista."

The defendants now claim that Lantini's testimony was insufficient to show that the fraud scheme continued after his incarceration in April 1994, and therefore that there was no proof that the July 22, 1994, mailing charged in

Count 3 was in furtherance of the scheme. We disagree with this characterization of the evidence. The defendants attempt to portray Lanas's statements that he was "taking care of everything" and "was meeting with Mr. Battista" as innocent remarks having nothing to do with the scheme, but the jury could have easily inferred from those statements that Lanas was continuing, in Lantini's place, to pay kickbacks to Battista in exchange for Alexsis work. And there was additional evidence to support the jury's conclusion: Lantini's testimony that Lanas told him, before he was imprisoned, that Lanas would be "tak[ing] care of the payments to Mr. Battista," and bank records showing that, after Lantini was imprisoned, Lanas continued to deposit Alexsis checks while at the same time withdrawing cash in the exact amount of the kickback owed. Viewing all this evidence most favorably to the government, as we must, *id.*, we conclude that a reasonable jury could have found that the July 22, 1994, mailing to Lanas resulted in a kickback to Battista. We likewise conclude that the jury could have found that the mailing resulted in a kickback to Hendershot, based on the fact that he was named as the claims adjuster on nearly all of Lanas's invoices and on Lantini's testimony that Battista said that half of the kickback money was going to Hendershot.

In a last-ditch effort, the defendants attack Lantini's testimony as "inherently suspect" under the principles of *Lilly v. Virginia*, 527 U.S. 116 (1999). The defendants have come close to waiving this point by failing to develop it in their appeal brief. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197-98 (7th Cir. 1997). But even assuming no waiver, their challenge fails. *Lilly*, which holds that it is a violation of the Confrontation Clause to admit the blame-shifting confession of a non-testifying accomplice, 527 U.S. at 134, simply has no application here. And finally, to the extent the defendants are attacking Lantini's credibility, we do not find his testimony to be "contrary to the laws of

nature or unbelievable on its face," *United States v. Scott*, 145 F.3d 878, 883 (7th Cir. 1998), and therefore reject their argument.

### C. New Trial Based on Newly Discovered Evidence

At trial the government called Michael Rusin of the Rusin law firm as one of its main witnesses. Rusin testified on direct examination that in 1991 Hendershot and Battista offered his firm the legal work for all of Alexsis's clients in exchange for a substantial kickback. At the time Rusin's firm was already handling some Alexsis clients, but Rusin stated that, once he turned down the kickback offer, no new Alexsis business came the firm's way. On cross-examination, however, Rusin was more equivocal, stating that after the 1991 meeting with Hendershot and Battista his firm received new cases from Alexsis clients, but they were from existing clients the firm had been handling since before the meeting. As to whether the firm received business from new Alexsis clients, Rusin said, "I can't honestly say. . . . I know I didn't receive any more files from Mr. Hendershot." Rusin also testified that he could not produce the billing records for the firm's Alexsis clients because those records were not available.

After trial the defendants learned that the billing records were in fact available and showed that the Rusin law firm did receive new Alexsis billings after Rusin turned down the kickback offer. The defendants moved for a new trial on the basis of this newly discovered evidence, but the district court denied their motion. We review that decision for abuse of discretion. *McClurge*, 311 F.3d at 874. A new trial based on newly discovered evidence that discloses false testimony should only be granted if (1) the court is reasonably satisfied that the witness testified falsely, (2) the jury might have reached a different conclusion without the false testimony, and (3) the moving party was taken by surprise

by the false testimony and was unprepared to meet it. *United States v. Reed*, 986 F.2d 191, 192-93 (7th Cir. 1993).

The defendants' challenge fails on a number of grounds. First, the district court properly found that Rusin's testimony on cross-examination that he could not recall whether he obtained new Alexsis business was sufficiently equivocal to support a finding of no perjury. Also, the defendants fail to show that the jury might have reached a different verdict if the newly discovered information had been available at trial. The defendants maintain that the evidence could have been used to impeach Rusin's credibility, asserting that the government presented Rusin as its "golden" witness—"an honest lawyer, who rejected kickbacks" and whose "unrebutted, 'loss of business' testimony was compelling evidence that the kickback offer occurred." But even assuming that Rusin's credibility could have been impeached in this manner, the government presented so much additional evidence—such as testimony from several other witnesses, Alexsis business records, and various bank records—that the jury could easily have found the defendants guilty even without Rusin's testimony. And finally, the defendants cannot claim surprise because they had subpoenaed the Rusin law firm's billing records before trial, knew well in advance of trial that Rusin did not intend to produce the information, yet failed to seek judicial enforcement of the subpoena prior to Rusin's testifying.

### D.  Juror Misconduct

Midway through trial the defendants became aware that a regular spectator, Mr. Bell, had been in daily contact with a juror, Mrs. Alexander. As a spectator Mr. Bell was privy to sidebar conversations and other proceedings that were not intended to be heard by the jury. Thus, at the request of defense counsel, the district court questioned Mr. Bell to determine whether he and Mrs. Alexander had ever dis-

cussed the case. In response Mr. Bell stated that he had been accompanying Mrs. Alexander to the courthouse each day but had not discussed the case with her at all: "Not one single time. I take this very seriously, very serious." When the court then asked the defendants whether they had any further questions, counsel for Hendershot and Battista both said, "Not at all," while counsel for Lanas said nothing. At no time did any of the defendants ask to have Mrs. Alexander questioned, nor did they ever invoke Fed. R. Evid. 606(b), which permits a juror to testify after the verdict has been rendered "on the question whether extraneous prejudicial information was improperly brought to the jury's attention" and on "whether any outside influence was improperly brought to bear upon any juror."

The defendants now claim that the district court erred in failing to receive assurances from Mrs. Alexander herself that she and Mr. Bell had not discussed off-the-record proceedings. We agree with the government, however, that Hendershot and Battista have waived this point by affirmatively representing that they were satisfied, based on the questioning of Mr. Bell, that Mrs. Alexander had not been improperly influenced. *United States v. Walton*, 255 F.3d 437, 441 (7th Cir. 2001). But this sort of affirmative relinquishment of rights is missing with regard to Lanas, who has therefore merely forfeited, not waived, the issue. *Id.* Accordingly, we review his challenge for plain error, *id.*, and we find that there was none. The district court is under no obligation to investigate the possibility of extraneous influence on a juror unless the defendants have made a colorable showing of taint. *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994). Here, the court conducted an adequate inquiry into any potential taint by questioning Mr. Bell in open court regarding his communications with Mrs. Alexander. Once Mr. Bell responded that he had not discussed the case with her at all, there was no reason for the court to continue to believe that Mrs. Alexander might

have been improperly influenced. This is especially true considering that defense counsel expressed satisfaction with Mr. Bell's responses and did not raise any further objection at any other time.

### E. Sentencing

We turn finally to the sentencing issues. The defendants first assert that the district court erred by proceeding under the commercial bribery and kickbacks guideline, U.S.S.G. § 2B4.1, rather than the guideline covering offenses involving fraud or deceit, *id.* § 2F1.1. This is an issue that we review *de novo. United States v. Serpico*, No. 02-1702, 2003 WL 359634, at *5 (7th Cir. Feb. 20, 2003).

As an initial matter, we note that, because the defendants were not sentenced until August and September 2001, the district court erred by using the 1998 version of the Guidelines, rather than the 2000 version. *See* U.S.S.G. § 1B1.11 ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Under § 1B1.2 of the 1998 Manual, the district court had discretion "in the atypical case" to sentence a defendant under a guideline other than the one recommended in the Statutory Index (Appendix A) for the offense of conviction, provided the charged conduct fit more closely within the other guideline. But the 2000 amendments dropped this language in order "to emphasize that the sentencing court must apply the offense guideline referenced in the Statutory Index for the statute of conviction unless the case falls within the limited 'stipulation' exception set forth in § 1B1.2(a)." *United States v. Gracia*, 272 F.3d 866, 876 (7th Cir. 2001) (quoting U.S.S.G. App. C Supp., amend. 591, at 32 (2000)). For the offense of mail fraud, 18 U.S.C. § 1341, the Statutory Index lists two possible guidelines: §§ 2C1.7 and 2F1.1. Neither party claims that § 2C1.7 is applicable, which leaves

§ 2F1.1, the guideline the defendants say the court was mandated to apply.

But the application notes to § 2F1.1 lead us to a different conclusion. Application Note 14 explains that "[i]n certain . . . cases, the mail or wire fraud statutes, or other relatively broad statutes, are used primarily as jurisdictional bases for the prosecution of other offenses." U.S.S.G. § 2F1.1, comment. (n.14). Thus, in those situations the court is allowed to use a guideline other than § 2F1.1 so long as "the indictment or information setting forth the count of conviction . . . establishes an offense more aptly covered by another guideline." *Id.* Applying the wrong version of the Guidelines therefore had no practical effect in this case; under either the 1998 or 2000 version, the court had the discretion to choose the guideline that best fit the defendants' charged conduct. *See United States v. Poirier*, No. 01-15989, 2003 WL 302262, at *6, n.8 (11th Cir. Feb. 13, 2003) (noting that the 2000 amendments left intact Application Note 14 to § 2F1.1).

The question then is whether the defendants' conduct is "more aptly" covered by the commercial bribery and kickbacks guideline than by the fraud and deceit guideline. With regard to Hendershot and Battista, we conclude that the district court made the right choice. As we explained in *United States v. Hauptman*, 111 F.3d 48 (7th Cir. 1997), in the usual case of commercial bribery, "either the person giving the bribe is being shaken down by a customer's purchasing agent, or, if the briber is the one taking the initiative, his objective is merely to get 'his share' of the customer's business." *Id.* at 50; *see also Mantek Div. of NCH Corp. v. Share Corp.*, 780 F.2d 702, 705 n.3 (7th Cir. 1986) ("The essence of commercial bribery is that the seller is secretly giving a bribe to the customer's agent to induce the agent to betray his principal (the customer) by purchasing the seller's product even though it is not in the customer's

best interest."). We have the former situation here: the essence of both Hendershot's and Battista's offense is that they, the purchasing agents, solicited and accepted bribes from various sellers and by doing so deprived Alexsis, the customer, of Hendershot's honest services. Granted, Hendershot and Battista were involved in straight fraud as well—for instance by ordering multiple investigations on the same claimant—but we agree with the district court that the core of their crime more closely resembles fraud achieved through bribery. We draw support for this conclusion from other cases that have applied bribery guidelines to fraud convictions. *E.g.*, *Serpico*, 2003 WL 359634, at *5-*6; *Poirier*, 2003 WL 302262, at *6-*7; *United States v. Montani*, 204 F.3d 761, 769-71 (7th Cir. 2000).

With regard to Lanas, however, the commercial bribery and kickbacks guideline is more of an awkward fit. True, Lanas was one of the people paying bribes to Hendershot and Battista, but was the paying of bribes the "essence" of his offense? We believe that it was not. Lanas's situation is much like *Hauptman*, where we found that the bribery was "the means used to defraud [the customer's] employer of a substantial amount of money." 111 F.3d at 51. So is the case here. Initially, Lanas refused Battista's offer of surveillance work in exchange for kickbacks because Lanas believed the kickback to be too high to make the proposition worthwhile. Lanas only agreed to the offer once he and Battista decided that he would bill Alexsis for two investigators on each job even though he was only using one. The indictment and proof at trial establish that Lanas submitted a number of these "false and fraudulent" invoices and thereby defrauded Alexsis out of a substantial sum of money. Thus, as in *Hauptman*, this was not "merely a case in which a bribe deprives the bribed employee's employer of the employee's undivided loyalty," *id.* at 50-51; it was a case of straight, substantial fraud made possible by the bribe.

So we disagree with the district court's decision to apply the commercial bribery and kickbacks guideline to Lanas, but we must of course decide whether the error was harmless. The base offense level for § 2B4.1 is two levels higher than for § 2F1.1, but nonetheless, the government says that it would not have made a difference which guideline was used because a two-level enhancement for "more than minimal planning" would have applied had Lanas been sentenced under § 2F1.1. *See* U.S.S.G. § 2F1.1(b)(2)(A). The defendants respond that this is merely speculation as the district court did not make any specific findings regarding such an enhancement. Instead, the court merely noted "its uncertainty about whether selection of § 2F1.1 would make a genuine difference in this case, where each Defendant is likely to face a two-level increase for the specific offense characteristic of 'more than minimal planning.'"

Despite the lack of specific findings, however, we conclude that the record itself is sufficient to show that an adjustment for more than minimal planning would have applied had Lanas been properly sentenced under § 2F1.1. We have said that the enhancement is appropriate where "criminal acts, each of which are not purely opportune, are repeated over a period of time." *United States v. Sonsalla*, 241 F.3d 904, 907 (7th Cir. 2001). In this case the district court found that Lanas was involved in no less than forty-eight transactions with Hendershot and Battista. This clearly suffices as more than minimal planning, and so whether Lanas was sentenced under § 2B4.1 or § 2F1.1, his offense level would have been the same. Further, we note that Lanas is by now no longer in prison, and so the only possible purpose remand would serve would be to give the district court the opportunity to change his term of super-

vised release.[1] But because the court has already made the decision to impose the statutory maximum term of three years applicable to Class D felonies, *see* 18 U.S.C. § 3583(b), remand for this purpose would almost certainly be fruitless.

Finally, the defendants claim that their offense level adjustment for the amount of loss should have been calculated according to the loss to Alexsis and not by their gain. But the defendants do not give any reasoning in support of this argument (which appears to be totally meritless, *see* U.S.S.G. §§ 2B4.1(b)(1), 2F1.1, comment. (n.9)), nor do they explain what the loss figure should be and how it would affect their sentences. For these reasons we agree with the government that this issue has been waived. *Matthews*, 128 F.3d at 1197-98.

### III. CONCLUSION

The judgment of the district court is AFFIRMED in all respects.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[1] Because Lanas is still serving his term of supervised release, his appeal is not moot. *United States v. Trotter*, 270 F.3d 1150, 1152-53 (7th Cir. 2001).