In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2925

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN BALDWIN,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-CR-787 — **John Robert Blakey**, *Judge.*

———————————

ARGUED SEPTEMBER 25, 2024 — DECIDED AUGUST 13, 2025

———————————

Before SCUDDER, KIRSCH, and MALDONADO, *Circuit Judges.*

KIRSCH, *Circuit Judge.* A jury convicted Shawn Baldwin of
seven counts of wire fraud for running a decade-long Ponzi
scheme. On appeal, Baldwin brings a host of challenges to his
conviction and sentence. We find no error and affirm.

I

Shawn Baldwin orchestrated a multiyear scheme to fraud-
ulently solicit more than $10 million from over a dozen

victims. Baldwin induced his victims to part with their money by convincing them that they were making legitimate investments. But in reality he put their funds to his own personal uses—spending on travel, entertainment, and jewelry, and sending money to his family. Baldwin also used later victims' money to repay earlier victims in classic Ponzi fashion.

Baldwin's fraudulent scheme was wide-ranging and evolved over time. It began with high school and college buddies, business contacts, and even a friend's widow. These victims invested their money directly with Baldwin, fooled by his veneer of professional success and promises of steep returns. Later, Baldwin evolved his scheme, recruiting additional victims to invest in a phony company he was starting called Currency Clicks. Baldwin claimed Currency Clicks was a social media platform for traders to exchange information, and he purportedly planned to sell it in an initial public offering (IPO) and turn a profit for his investors. But Currency Clicks too was a sham. Baldwin never built it into a real business, instead spending his victims' money and draining Currency Clicks's bank account. Finally, Baldwin's scheme included his exploitation of Luca Tenuta, a European businessman, and two entities Tenuta controlled. Among other things, Baldwin folded Tenuta into the scheme by using his money to make extensive Ponzi payments to other victims. All told, Baldwin bilked Tenuta out of more than $8 million.

Despite the many victims and multiple phases of Baldwin's scheme, some things remained consistent throughout. Baldwin constantly lied about his professional connections and success. He concocted false business entities and either wholly fabricated or grossly overstated the credentials of various employees and associates. He misrepresented and

concealed disciplinary actions against him and his companies brought by the Financial Industry Regulatory Authority (FINRA), the Securities Exchange Commission, the Illinois Securities Department, and the Illinois Secretary of State. He deceived victims about what he did with their money—fabricating new ventures, lying about efforts to recover unsuccessful investments, falsifying reasons why he couldn't reclaim frozen assets, and transferring funds from later victims to earlier ones to lull them into false senses of security. Above all, Baldwin lied about the legitimacy of the investment opportunities, which served only to further his illicit scheme and line his own pockets.

After the jury convicted Baldwin, the district court sentenced him to 204 months' imprisonment. On appeal, Baldwin raises a variety of challenges to his conviction and sentence. We address them in turn, supplying further detail where relevant.

## II

## A

We begin with Baldwin's challenge to the testimony of the government's star witness, Luca Tenuta. Tenuta was an Italian businessman who lived in Monaco and whom Baldwin first encountered at an investment meeting in London. As trial neared, Tenuta refused to travel to the United States to testify. So about three weeks before trial, the district court authorized the government to depose him by video pursuant to Federal Rule of Criminal Procedure 15, with the parties and judge in Chicago and Tenuta in London. Rule 15 permits a party to "move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion

because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). During trial, the district court admitted and played for the jury a recording of Tenuta's deposition.

Baldwin argues that the taking and admission of Tenuta's deposition violated Rule 15 and his Sixth Amendment Confrontation Clause rights. These arguments depend on the specific objections he raised as well as the government's and court's responses, thus requiring us to undertake a careful review of the record. As such, we first recite the relevant exchanges before explaining why, ultimately, Baldwin's challenges fail.

Tenuta was the biggest victim of Baldwin's fraud, and the size of his losses made him a critical witness for the government. He controlled two investment vehicles—one on behalf of a client and one for himself. During the course of their relationship, Baldwin convinced Tenuta to part with about $8.2 million of investment funds, including about $5.2 million of pre-IPO shares in a company called Rok Stars, PLC. Tenuta also wired an additional $1 million to Baldwin to purchase shares in the company Alibaba, but Baldwin returned the money after Tenuta quickly changed his mind.

During preparations for trial, Tenuta was at first cooperative, attending video and phone conferences and appearing willing to travel to Chicago to testify. But as trial approached, Tenuta's cooperativeness waned. He expressed security concerns about journeying to Chicago, and he raised a scheduling conflict regarding a surgery his mother was having, explaining that her post-operative care would require him to remain in Italy. The government attempted to assuage Tenuta's misgivings and eventually came to believe he would still travel to

Chicago for trial—that is, until it began coordinating his flight and hotel arrangements. At that point, Tenuta's attorney communicated that Tenuta had renewed concerns. The government again attempted to address them, but after some email exchanges, Tenuta's attorney announced Tenuta's refusal to come to the United States to testify. The attorney explained, though, that Tenuta was willing to sit for a deposition in London. So the government worked with its Office of International Affairs, eventually concluding that a London deposition was the best way to obtain Tenuta's testimony. It then filed a motion to preserve and present Tenuta's testimony under Rule 15.

The district court held a hearing on the motion. Baldwin objected to deposing Tenuta in London pursuant to Rule 15, arguing that there were no exceptional circumstances justifying the deposition and that Baldwin had "the right to have the jury observe [Tenuta] in his natural demeanor in the courtroom." The district court reserved its ruling and asked the government to inquire whether Tenuta would be willing to attend the trial if it were moved until after his mother's surgery. The government obliged, but Tenuta's attorney emailed the government the next day to declare that Tenuta "definitively will not come to the US." With confirmation of Tenuta's apparently intractable, final position, the government saw no alternative to a Rule 15 deposition and maintained its motion.

The district court held a second hearing on the matter. Baldwin's counsel reiterated Baldwin's opposition to the deposition. She again argued that no exceptional circumstances existed and objected in particular to Tenuta's physical absence from trial. She said:

> To allow the government to depose this witness, have him testify outside of the presence of the jury so that the jury is not in a position to be able to observe him one on one from the witness stand where it should be able to[,] where he's not subject to the courtroom and also to looking at your Honor, myself and Mr. Baldwin, we believe that it would be prejudicial for the deposition to go forward.… It's a lot easier to lie from FaceTime than it is … face-to-face, Judge. So I think the absent being in front of the jury with the courtroom in front of [Tenuta], Mr. Baldwin physically there, although potentially we could work that out, it does prejudice our ability to observe and certainly the jury's ability to observe his demeanor and make a determination on his veracity.

The district court acknowledged that Baldwin was "objecting and preserving [his] arguments under Rule 15," and inquired whether, if it "were to grant the Rule 15, would [the parties] be able to conduct it in this courtroom with me doing contemporaneous [rulings on objections?]" The court clarified its plan for "everyone … to be here except the witness," and asked, "is that something the parties would be able to work out?" Baldwin's counsel responded, "If your Honor is inclined to grant the motion, that would be my preference." The district court promptly granted the government's Rule 15 motion, finding generally that exceptional circumstances existed and the interests of justice were met. It also stated, without elaborating, that it made "the case-specific findings under Rule 15."

One final time before trial, the court and parties addressed Tenuta's deposition. At a status conference convened to discuss Baldwin's health following a medical emergency, the court and parties considered the possibility of cancelling Tenuta's deposition and instead presenting his testimony to the jury through live video feed during trial. Baldwin's counsel repeated her objection "to the deposition in the first place," but other than that "general objection to conducting [Tenuta's] testimony by deposition," counsel had no "issue with the government presenting [Tenuta's] testimony through live feed during the course of the trial." Pondering its decision, the court observed that such testimony is "not really a deposition." Baldwin's counsel agreed, mentioning explicitly for the first time a Confrontation Clause concern: "In fact," she said, "I still think that there's some confrontational issues but we've covered those. Your Honor has overruled my objection. If [live video testimony is] how the government wishes to proceed, then I think that that would be the most appropriate way to proceed."

Baldwin's counsel's first explicit mention of a confrontational issue elicited an immediate interjection from the government. Recognizing a potential legal issue on appeal, the government clarified that it would only pursue Tenuta's live video testimony if Baldwin waived his Confrontation Clause rights. Without that waiver, the government clarified, it preferred "the Rule 15 deposition before the trial begins." Counsel responded, "We do object," and the court replied, "Well, you have your answer on that."

Tenuta's Rule 15 deposition finally took place a few weeks before trial. At the start, Baldwin's counsel renewed her objection that there were no exceptional circumstances, and the

district court again overruled it. The deposition lasted two days, and Baldwin sat in the courtroom in Chicago beside his counsel the whole time. The parties examined Tenuta and the judge ruled on objections from the courtroom, just as if Tenuta were actually testifying at trial. Later, during trial, the court admitted and the government played for the jury a recording of Tenuta's deposition. Baldwin raised no objections at that time.

Now on appeal, Baldwin argues that Tenuta's testimony violated Rule 15 and his Sixth Amendment Confrontation Clause rights. We disagree.

1

Starting with Rule 15, Baldwin advances two separate arguments. He contends that the district court abused its discretion, first, under Rule 15(a)(1) by incorrectly finding that exceptional circumstances existed and, second, under Rule 15(c)(2) and (3) by denying Baldwin the right to be physically present at the deposition. Neither argument is availing.

Rule 15(a)(1) provides that in "exceptional circumstances" and if "in the interest of justice," the court may permit a party to depose a prospective witness and preserve his testimony for use at trial. District courts "retain[] broad discretion" to define exceptional circumstances. *United States v. Farfan-Carreon*, 935 F.2d 678, 679 (5th Cir. 1991). One situation in which they exist is when the prospective witness is unavailable to testify at trial and his testimony is material. *United States v. Drogoul*, 1 F.3d 1546, 1552 (11th Cir. 1993); *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984); see also *United States v. Knox*, 540 F.3d 708, 717–18 (7th Cir. 2008) (discussing factors other courts have considered without adopting a position).

Baldwin concedes that Tenuta's testimony was material but contests his unavailability.

We have not previously defined unavailability for Rule 15(a) purposes. But we have recognized that "foreign nationals," like Tenuta, "are beyond the court's subpoena power." *Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010); see also *Johnpoll*, 739 F.2d at 709 (foreign nationals are "not amenable to service of United States process"). The issue becomes, then, how likely the foreign national is to testify at trial and how he must declare his unwillingness or inability to do so. See *Drogoul*, 1 F.3d at 1553, 1557; *United States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980). The Eleventh Circuit has held that there need only be "a substantial likelihood … that the proposed deponent will not testify at trial" rather than a "concrete showing" and expressly declined to require an affidavit proving the witness's unavailability or to "require the government to assert with certainty that a witness will be unavailable for trial months ahead of time." *Drogoul*, 1 F.3d at 1553 (quotation omitted). Similarly, the Second and Fifth Circuits have also found sufficient representations by counsel about a witness's unavailability (including because of refusal to enter the United States) and declined to require an affidavit as corroboration. *Sindona*, 636 F.2d at 803–04; *Farfan-Carreon*, 935 F.2d at 679–80.

We agree with our sister circuits. One way in which a witness is unavailable within the meaning of Rule 15(a)'s exceptional circumstances requirement is when he is beyond the subpoena power of the United States and the court finds that he is substantially unlikely to testify in person at trial. It is enough for the court to base its finding on a party's representations about the witness's unwillingness or inability to

testify. See *Drogoul*, 1 F.3d at 1553, 1557; *Sindona*, 636 F.2d at 803–04.

That is what happened here. Tenuta was an Italian citizen residing in Monaco, so he was undoubtedly beyond the subpoena power of the United States. And he was substantially unlikely to testify at trial: he had unequivocally declared his unwillingness to come to the United States to testify in person, despite the court's and government's efforts. As an aside, there is no reason to think that the government's efforts were insincere—it's hard to imagine a reason why the government would want to present its star witness to the jury by way of recorded video rather than live testimony. After all, the government carries the burden of proof, so it shoulders the consequences of any credibility concerns arising from recorded testimony. Nevertheless, Tenuta remained steadfast in his refusal to travel for the trial. Because Tenuta, a key witness, was beyond the subpoena power of the United States and substantially unlikely to testify at trial, there was an exceptional circumstance within the meaning of Rule 15(a). The district court did not abuse its discretion in finding so.

Turning next to Baldwin's other Rule 15 challenge, he argues the district court abused its discretion under sections (c)(2) and (3) by denying him the right to be physically present at Tenuta's deposition. Rule 15(c)(2) gives a defendant not in custody (like Baldwin) the right to be present at the deposition, but only if he "request[s]" it. And even when requested, this right is not absolute. Rule 15(c)(3) creates an exception when the deposition occurs abroad: if the court makes certain enumerated "case-specific findings," it may authorize "the deposition of a witness who is outside the United States … without the defendant's presence."

Baldwin's argument fails from the get-go because he waived his Rule 15(c)(2) right to be present. At no point did he request to be present at Tenuta's deposition in London; rather, his counsel made clear a preference to remain in Chicago. At the second hearing on Tenuta's deposition, the court asked if conducting the deposition with "everyone ... here except the witness" was "something the parties would be able to work out?" Baldwin's counsel responded, "If your Honor is inclined to grant the [Rule 15] motion, that would be my preference." This explicit preference to remain in Chicago constituted a waiver of Baldwin's right under Rule 15(c)(2) to be physically present at Tenuta's deposition. See *United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (cleaned up). And that should come as no surprise. Traveling abroad to conduct a deposition less than one month before a three week federal criminal trial would have infringed on precious preparation time.

Baldwin also complains that Rule 15(c)(3)'s exception for foreign depositions doesn't apply because the district court failed to make the case-specific findings necessary to override his right to be present. But we need not address Baldwin's complaint because his waiver of his right to be present under Rule 15(c)(2) obviated the need for any case-specific findings under Rule 15(c)(3).

### 2

We now proceed to Baldwin's Sixth Amendment Confrontation Clause challenge. The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. This right "generally requires a

witness's physical presence at trial under oath and the chance for the jury to observe the witness's demeanor." *United States v. Protho*, 41 F.4th 812, 826 (7th Cir. 2022). Baldwin argues that the admission and presentation to the jury of Tenuta's deposition recording violated his Confrontation Clause rights because the deposition was taken in his physical absence. But by waiving his right to be present at the Rule 15 deposition, Baldwin also waived this Confrontation Clause argument.

We have previously held that there is no Confrontation Clause violation when a district court admits a properly conducted Rule 15 deposition. *United States v. Cannon*, 539 F.3d 601, 603–04 (7th Cir. 2008); *United States v. McGowan*, 590 F.3d 446, 456 (7th Cir. 2009). To be sure, in those cases the defendant was present at the deposition, and here Baldwin was absent from Tenuta's. But that is a distinction without a difference because Baldwin waived his right to be present, which means his deposition was properly conducted. Further, under these circumstances, Baldwin cannot claim that he waived his Rule 15 right to be present without understanding its future Confrontation Clause implications. He knew full well that the government would offer a recording of the deposition into evidence at trial. His counsel confirmed this knowledge by raising confrontational concerns about Tenuta testifying by live video feed. And, most tellingly, counsel did not object at trial when the district court eventually admitted the deposition recording.

Permitting Baldwin to advance a Confrontation Clause objection premised on his absence from the Rule 15 deposition, an absence he explicitly preferred, would be nonsensical. When a criminal defendant affirmatively waives his right to be present at a Rule 15 deposition conducted for the

unmistakable purpose of admitting it at an impending trial, he cannot then advance a Confrontation Clause challenge when the government later seeks to admit that deposition.

B

Baldwin brings four additional challenges to his conviction and sentence. We dispose of them in short order.

1

Baldwin challenges the testimony of FBI forensic accountant David Paniwozik. He argues Paniwozik provided false testimony and that the district court abused its discretion by denying his attendant motion for mistrial. See *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015) ("We review a denial of a mistrial for an abuse of discretion with an extra helping of deference."). Specifically, Baldwin contends that Paniwozik perjured himself when he testified that he had reviewed "the universe" of Baldwin's business, personal, and trading accounts. Paniwozik analyzed 51 of Baldwin's accounts, but his analysis did not include some accounts Baldwin had at Goldman Sachs. Thus, Baldwin says, Paniwozik lied to the jury that he had reviewed the universe of Baldwin's accounts, thereby tainting the jury's verdict. See *United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019) (standard for new trial based on perjured testimony).

But Baldwin distorts Paniwozik's statements. Paniwozik's testimony was not false because he made clear that he analyzed only those 51 accounts; he never purported to have analyzed all of Baldwin's accounts. He testified about "the universe of accounts that [*he*] analyzed." (emphasis added). Baldwin's argument is divorced from context and common sense. Moreover, the jury was not misled because Baldwin had a

chance to present his side of the story when he testified that
Paniwozik's analysis did not include many accounts and in-
troduced evidence regarding two of them. And in any event,
those Goldman Sachs accounts were unimportant; the gov-
ernment never possessed records of them in the first place.

2

Before trial, Baldwin also argued that the government
could not try all the charged counts together because they in-
volved separate victims in different schemes. Specifically, he
said the indictment improperly joined the counts in violation
of Federal Rule of Criminal Procedure 8(a) and, alternatively,
that the district court should have severed the counts under
Rule 14 to avoid prejudice. The district court denied his mo-
tion. Baldwin renews these arguments on appeal. We review
a district court's ruling on joinder de novo and, if joinder was
proper, its denial of a motion to sever for abuse of discretion.
*United States v. Peterson*, 823 F.3d 1113, 1124 (7th Cir. 2016).

Rule 8(a) permits joinder of two or more offenses in a sin-
gle indictment if the offenses "are of the same or similar char-
acter, or are based on the same act or transaction, or are con-
nected with or constitute parts of a common scheme or plan."
To determine proper joinder, we look to "the face of the in-
dictment rather than the evidence adduced at trial." *United
States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008). "We
construe [Rule 8(a)] broadly in the interest of conserving judi-
cial resources and avoiding costly, duplicative trials." *Id.* The
Rule does not require that offenses be "connected temporally
or evidentially." *United States v. Coleman*, 22 F.3d 126, 133 (7th
Cir. 1994). Baldwin therefore faces an uphill climb, especially
because "[e]ven where misjoinder occurs, we will not reverse
unless the defendant can show actual prejudice—i.e., that the

error had substantial and injurious effect or influence in determining the jury's verdict." *Blanchard*, 542 F.3d at 1141 (cleaned up).

The offenses were properly joined in this case. Baldwin says there was no common scheme or plan linking the counts; he argues that the indictment involved four separate victims engaged in distinct transactions occurring at different times. But the counts were all connected. Each was part of Baldwin's overarching Ponzi scheme. Using a variety of tactics, Baldwin duped his victims into giving him money, which he misused for personal purposes and to repay other victims. This robbing-Peter-to-pay-Paul nature of Baldwin's scheme is more than enough to satisfy Rule 8(a). What's more, the indictment needed only allege an overarching scheme on its face. *Id.* at 1141. It did, describing the scheme in paragraphs 1–17 and incorporating that scheme by reference in all counts. Accordingly, Baldwin's offenses were properly joined under Rule 8(a).

Baldwin's Rule 14 argument fares no better; in fact, he waived it. Rule 14(a) allows a court to sever offenses if joinder "appears to prejudice a defendant or the government." "Generally, failure to renew a motion to sever at the close of evidence results in waiver." *United States v. Tinsley*, 62 F.4th 376, 382 (7th Cir. 2023) (cleaned up). That is precisely what happened here. At the close of evidence, Baldwin moved for a judgment of acquittal but failed to renew his motion for severance, thereby waiving it.

Such waiver "may be excused where renewal would have been futile," but "[p]roving futility is a high bar." *Id.* (cleaned up). The district court must make "abundantly clear that filing such a motion would be useless." *Id.* (quotation omitted);

see also *United States v. Maggard*, 865 F.3d 960, 970 (7th Cir. 2017) (even if court repeatedly overrules motion to sever, no futility "unless the court explicitly indicates that such a renewed motion will not be entertained"). Baldwin pursues the futility exception, arguing that the district court's pretrial order showed that renewing his motion to sever would have been useless. Not so. At the close of evidence, the district court twice invited Baldwin to make his motions. It first asked if there were "[a]ny other requests from the defense," and Baldwin's counsel argued for a judgment of acquittal but nothing more. Moments later, the court gave Baldwin another chance, double-checking whether there was "[a]nything else we need to address before we bring [the jury] out …?" Baldwin's counsel replied, "No," thereby waiving the severance argument Baldwin now makes. See *Tinsley*, 62 F.4th at 382 (making oral motion for acquittal but not renewing motion to sever constitutes waiver).

3

Baldwin also argues that the district court abused its discretion by admitting evidence regarding victims who were not named or involved in the specific wires charged in the indictment. See *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019) (reviewing district court's decision to admit evidence for abuse of discretion). He says this evidence violated Federal Rule of Evidence 404(b) as improper propensity evidence and Rule 403 as unfairly prejudicial and needlessly cumulative. But again, Baldwin is mistaken.

Evidence regarding Baldwin's uncharged victims was direct evidence of his overall Ponzi scheme to fraudulently solicit more than $10 million, and "[d]irect evidence of a charged offense … does not implicate Rule 404(b)—even

when it is also possible to draw a forbidden propensity inference from th[at] evidence." *United States v. Dukes*, __ F.4th __, No. 24-1928, 2025 WL 2213221, at *3 (7th Cir. Aug. 5, 2025) (quotation omitted). "Put another way, when the wording of the allegations about the charge in the pleading is expansive enough to encompass the conduct in question, it is not [Rule 404(b)] evidence at all." *Id.* (quotation omitted). That is the case here: the scope of Baldwin's scheme is not limited to the wires specifically charged in the indictment. See *United States v. Lanas*, 324 F.3d 894, 901 (7th Cir. 2003). A transaction "in furtherance of a scheme to defraud is simply the element that confers federal jurisdiction under the … fraud statute; but a fraud scheme can produce proceeds long before the act that ultimately triggers jurisdiction." *Id.* Baldwin's indictment alleged one overarching scheme, so evidence relating to victims not named in the charged wires "was not Rule 404(b) evidence at all but was properly admitted as proof of that overall scheme." *Id.* And because this evidence was highly probative of Baldwin's overall scheme, it was not unduly prejudicial or unnecessarily cumulative—so his Rule 403 argument fails too.

### 4

Finally, Baldwin contests his sentence. At sentencing, the district court found U.S.S.G. §§ 2B1.1(b)(1)(K), 2B1.1(b)(9)(C), and 2B1.1(b)(20)(A) applied and imposed the corresponding offense-level enhancements. Baldwin argues this was error. "We review the district court's application of the sentencing guidelines de novo and its factual findings for clear error." *United States v. Wilkinson*, 986 F.3d 740, 743 (7th Cir. 2021) (quotation omitted).

i

Section 2B1.1(b)(1) provides for escalating offense-level increases based on the amount of loss. At sentencing, the district court determined that Baldwin's total loss amount was $11,796,400 based on intended loss and gave Baldwin a 20-level increase. See U.S.S.G. § 2B1.1(b)(1)(k). On appeal, Baldwin argues the district court inflated his loss amount by at least $4,300,000, such that he should have received only an 18-level increase. See *id.* at § 2B1.1(b)(1)(j). He specifically objects to the district court's loss findings related to Tenuta's Rok Stars and Alibaba investments.

Under § 2B1.1(b)(1), loss is "the greater of actual loss or intended loss." *Id.* § 2B1.1, app. n.3(A). "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.* at app. n.3(A)(ii). In calculating intended loss, the district court "asks how many dollars the culprit['s] scheme put at risk." *United States v. Elizondo*, 21 F.4th 453, 473 (7th Cir. 2021). The court's calculation "must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose." *Id.* (cleaned up).

The district court's loss amount determination was not clear error, and it properly applied § 2B1.1(b)(1). Though the value of the Rok Stars shares may have been difficult to pinpoint at times throughout Baldwin's scheme, the district court made "a reasonable estimate of the loss" by analyzing account statements indicating their fair market value. U.S.S.G. § 2B1.1, app. n.3(C). This reasonable estimate is all that is required. *Id.* With respect to the Alibaba shares, though Baldwin promptly returned the $1 million Tenuta gave him, that return of funds was in furtherance of the scheme and thus properly included in the loss calculation. See *United States v. Stochel*, 901 F.3d 883,

890 (7th Cir. 2018) ("Nominally legitimate payments are not offset against intended loss when they are intertwined with and an ingredient of an overall fraudulent scheme.") (cleaned up). By returning the funds, Baldwin lulled Tenuta into believing his handling of Tenuta's money was legitimate, enabling him to carry on his Ponzi scheme. So, the district court properly applied § 2B1.1(b)(1).

ii

Section 2B1.1(b)(9)(C) provides for a two-level increase if "the offense involved … a violation of any prior, specific … administrative order, injunction, decree, or process." A few months after Baldwin first struck up a relationship with Tenuta, the Illinois Secretary of State barred Baldwin from giving investment advice in or from Illinois. Baldwin nevertheless continued to advise Tenuta to purchase shares in various companies. Baldwin thus violated the express terms of the Secretary of State's order, warranting the offense-level increase under § 2B1.1(b)(9)(C). Baldwin argues that none of these occasions constituted investment advice, but that is patently false. Indeed, Baldwin admitted he did not have the discretion to execute trades without direction from Tenuta, so his guidance to Tenuta to buy various shares was necessarily investment advice.

iii

Section 2B1.1(b)(20)(A) provides a four-level increase if: (1) "the offense involved … a violation of a securities law"; and (2) "at the time of the offense, the defendant was … a registered broker" or "an investment adviser," or "associated with" such a broker or advisor. Baldwin argues that he was not convicted of violating any securities laws, nor was he ever

a registered broker-dealer, ever associated with a registered broker-dealer, or ever acted as an investment adviser.

But this section does not require Baldwin to have been convicted of a securities law violation, only that his convictions "involve" a securities law violation. U.S.S.G. § 2B1.1(b)(20)(A) & app. n.16(B). That is, the guideline applies to "a defendant convicted under a general fraud statute if [his] conduct violated a securities law." *Id*. at app. n.16(B). The application notes define securities law very broadly. The definition includes 18 U.S.C. §§ 1348 and 1350, certain provisions of the Securities Exchange Act of 1934, and "the rules, regulations and orders issued by the Securities and Exchange Commission" under those provisions. *Id.* at app. n.16(A). Under this capacious definition, the conduct for which Baldwin was convicted clearly involved violations of securities laws. See, e.g., *SEC v. Smart*, 678 F.3d 850, 856–57 (10th Cir. 2012) (finding securities law violation where defendant took victims' money under guise of secure investments but instead used that money for personal purposes and to make Ponzi payments); *SEC v. George*, 426 F.3d 786, 788–89 (6th Cir. 2005) (similar).

And Baldwin was a registered broker during the early period of his scheme: the government established through stipulation that one of Baldwin's companies was a registered broker with FINRA until FINRA expelled it (and Baldwin) three years into the charged scheme. Baldwin was also an investment advisor, which the application notes define by reference to 15 U.S.C. § 80b-2(a)(11) as one who, "for compensation, engages in the business of advising others … as to … the advisability of investing in … securities." U.S.S.G. § 2B1.1, app. n.16(A). Baldwin meets this definition because he advised his

victims to invest in securities, held himself out as someone who provided such advice, and received compensation when he used victims' funds for his own purposes. See, e.g., *Abrahamson v. Fleschner*, 568 F.2d 862, 870–71 (2d Cir. 1977) (holding that "persons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute," and that "many investment advisers 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds"), abrogated on other grounds by *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979). In sum, the district court properly applied and imposed the relevant offense-level enhancements.

AFFIRMED